[No. 42198. En Banc. March 8, 1973.]

MARCO DEFUNIS *et al., Respondents,* v. CHARLES ODEGAARD *et al., Appellants.*

12

[redacted]

*Slade Gorton, Attorney General,* and *James B. Wilson, Senior Assistant,* for appellants.

*Lycette, Diamond & Sylvester, Josef Diamond, Lyle L. Iversen,* and *Craig S. Sternberg,* for respondents.

*Michael Rosen, Robert Mussehl, Arval A. Morris, G. Robert Brain, John H. Sennhauser, Philip L. Burton, Jack P. Scholfield, Betty B. Fletcher, Burroughs B. Anderson, Harold F. Vhugen, Walter H. Hageman, Jr., Gale D. Barbee, Brian L. Comstock, William L. Dwyer, David B. Hoff, Edward N. Lange, Hugh R. McGough, Muriel Mawer, Howard P. Pruzan, Edmund B. Raftis, Joseph H. Gordon, Grant Armstrong, John Gant, Jorgen G. Bader, George Constable, Jennings P. Felix, Robert Baronsky,* and *Ralph B. Potts,* amici curiae.

Defendants, who include the members of the Board of Regents of the University of Washington, the president of the university, and the dean and certain members of the Admissions Committee of the University of Washington School of Law, appeal from a judgment ordering them to admit plaintiff Marco DeFunis, Jr., as a first-year student to the University of Washington School of Law, as of September 22, 1971.

Broadly phrased, the major question presented herein is whether the law school may, in consonance with the equal protection provisions of the state and federal constitutions, consider the racial or ethnic background of applicants as one factor in the selection of students.

Marco DeFunis, Jr. (hereinafter plaintiff), his wife, and his parents commenced an action in the superior court, alleging that plaintiff, an applicant for admission to the University of Washington School of Law (hereinafter law school) for the class commencing September 1971, had been wrongfully denied admission in that no preference was given to residents of the state of Washington in the admissions process and that persons were admitted to the law school with lesser qualifications than those of plaintiff. The complaint asked that the court order the defendants to admit and enroll plaintiff in the law school in the fall of 1971 and, upon the failure of defendants to do so, that

plaintiffs recover damages in the sum of not less than $50,000.

The superior court granted a temporary restraining order and order to show cause, restraining defendants from selecting students for admission to the law school during the pendency of the action. Defendants, in turn, moved to dismiss the complaint on the grounds that the court lacked jurisdiction of the cause and that the complaint failed to state a claim upon which relief could be granted.

The superior court dismissed that portion of the plaintiff's complaint seeking monetary damages. The balance of defendants' motion to dismiss was denied, and a temporary injunction was entered enjoining the defendants from admitting students to the law school "in a number which would preclude the admission of plaintiff, Marco DeFunis, Jr., to the 1971-72 first year class, should his admission eventually be ordered by the court." After a nonjury trial, the court ruled that in denying plaintiff admission to the law school, the University of Washington had discriminated against him in violation of the equal protection of the laws guaranteed by the fourteenth amendment to the United States Constitution.

Law school admissions pose a complex problem, and require a sensitive balancing of diverse factors. To gain insight into the complicated process of selecting first-year law students, and to better appreciate the essence of plaintiff's complaint against the law school, we turn first to the circumstances and operative facts—as delineated by the record—from which this litigation arises.

Under RCW 28B.20.130(3), the Board of Regents of the University of Washington has the power and duty to establish entrance requirements for students seeking admission to the university. The dean and faculty of the law school, pursuant to the authority delegated to them by the Board of Regents and the president of the university, have established a committee on admissions and readmissions to determine who shall be admitted to the law school. For the

academic year September 15, 1970, to June 15, 1971, the committee was composed of five faculty members and two student members; on June 7, 1971, the faculty of the law school expanded the membership of the committee to six faculty members and three student members. The chairman estimated that the committee spent over 1,300 hours in the selection process for the 1971-72 first-year class.

The number of qualified applicants to the law school has increased dramatically in recent years. In 1967, the law school received 618 applications; in 1968, 704; in 1969, 860; and in 1970, 1,026 applications were received. The law school received 1,601 applications for admission to the first-year class beginning September, 1971. Under the university's enrollment limitation there were only 445 positions allotted to the law school, and of these the number available for the first-year class was between 145 and 150. The chairman of the admissions committee stated that most of these applicants would be regarded as qualified by admissions standards at this and other comparable law schools in recent years. Hence, the task of selection is difficult, time-consuming and requires the exercise of careful and informed discretion, based on the evidence appearing in the application files. While many applicants are relatively easy to select for admission because of very outstanding qualifications, and others are relatively easy to reject, the middle group of candidates is much more difficult to assess. Plaintiff was in this latter category.

Applicants for admission to the law school must have earned an undergraduate degree and taken the Law School Admission Test (LSAT) administered by the Educational Testing Service of Princeton, New Jersey. They must also submit with their written application a copy of transcripts from all schools and colleges which they have attended prior to application for admission, together with statements from their undergraduate dean of students and letters of recommendation from faculty members in their major field of study. They may submit additional letters of recommendation and statements. The application for admission gives

the applicant the option to indicate his "dominant" ethnic origin. The admissions process does not include personal interviews and does not reveal whether applicants are poor or affluent.

The committee's basic criteria for selecting students are expressed in the "Guide for Applicants", a copy of which plaintiff received with his 1971 application:

> We below describe the process we applied to determine the class that entered the University of Washington School of Law in September 1970. We anticipate that the same process will be applied in determining membership in the class of 1971.
>
> . . .
>
> In assessing applications, we began by trying to identify applicants who had the potential for outstanding performance in law school. We attempted to select applicants for admission from that group on the basis of their ability to make significant contributions to law school classes and to the community at large.

For the purpose of a preliminary ranking of the applicants for the class of 1974, the junior-senior undergraduate grade point average and the Law School Admissions Test scores[1] for each applicant were combined through a formula to yield a predicted first-year of law school grade average for the applicant. This preliminary index number is called the Predicted First-Year Average (PFYA). The relative weight of grades and test scores in this formula was determined on the basis of past experience at the law school. The same formula is used for all applicants in a given year. If an applicant has taken the LSAT more than once in the past 3 years, the average score is employed rather than the latest score; this is done to offset a learning effect which statistical studies by the Educational Testing Service indicate occurs as the result of the multiple taking of the test.

Plaintiff's PFYA, as determined by the law school, was 76.23. This figure was calculated by using a formula com-

---

[1]The Law School Admissions Test yields two scores for each candidate, a general law aptitude score and a writing ability score.

bining plaintiff's junior-senior grade point average of 3.71, average LSAT score of 582 (512 plus 566 plus 668, divided by 3)[2] and average writing test score component of 61 (62 plus 58 plus 64, divided by 3).

Ranking of applicants by PFYA was used to help organize the committee's processing of the applications. On the basis of the previous year's applicant group, the committee decided that most promising applicants for the class of 1974 would be defined as applicants with predicted first-year law school averages over 77. Applicants with PFYAs above 77 were reviewed and decided by the full committee as they came in, in order to reach an early decision as to the acceptance of such students. Each of these files was assigned to a committee member for thorough review and for presentation to the committee.

Applicants with PFYAs below 74.5 were reviewed by the chairman of the committee, and were either rejected by him, or placed in a group for later review by the full committee. The decision of rejection or committee review of an application was based on the chairman's judgment derived from information in the applicant's file indicating whether the applicant had a significantly better potential for law study than the relatively low predicted first-year average tended to indicate. Cases of doubt were to be resolved in favor of deferring judgment until committee review could be undertaken.

Two exceptions were made in regard to applicants with PFYAs below 74.5. First, the law school had established a policy that persons who had been previously admitted but who were unable to enter, or forced to withdraw from, the law school because of induction into the military service, had a right to reenroll if they reapplied immediately upon honorable completion of their tour of duty. Second, all files of "minority" applicants (which the committee defined for this purpose as including Black Americans, Chicano Ameri-

---

[2]Plaintiff took the Law School Admissions Test on three different occasions: August 1969, November 1969 and December 1970.

cans, American Indians and Philippine Americans[3]) were considered by the full committee as warranting their attention, regardless of the PFYA of the individual applicant.

Applicants with predicted first-year averages between 74.5 and 76.99 were accumulated and held until the applications deadline had passed and essentially all the applications were complete and ready for review, so that the critical decisions as to the remainder of the incoming class could be made with a relatively complete view of qualified applicants not therebefore admitted. Plaintiff's application, presenting a 76.23 predicted first-year average, was placed in this third category. Included for consideration at that time, in addition to the minority group and those with PFYAs between 74.5 and 77, were some applicants with PFYAs above 77 upon whom the committee had reserved judgment, feeling that such applicants were not as promising as their PFYAs seemed to indicate.

These "close cases,"—*i.e.,* where the applicant was neither clearly outstanding nor clearly deficient—required the most effort of the committee. In selecting the applicants from this narrow range, the committee used the process described in its Guide for Applicants, a copy of which was sent to all applicants:

> We gauged the potential for outstanding performance in law school not only from the existence of high test scores and grade point averages, but also from careful analysis of recommendations, the quality of work in difficult analytical seminars, courses, and writing programs, the academic standards of the school attended by the applicant, the applicant's graduate work (if any), and the nature of the applicant's employment (if any), since graduation.
>
> An applicant's ability to make significant contributions

---

[3]The chairman of the admissions committee testified that Asian Americans, *e.g.,* were not treated as "minority" applicants for admissions purposes, since a significant number could be admitted on the same basis as general applicants.

As used herein, the term "minority" refers to and includes only Black Americans, Chicano Americans, American Indians and Philippine Americans.

to law school classes and the community at large was assessed from such factors as his extracurricular and community activities, employment, and general background.

We gave no preference to, but did not discriminate against, either Washington residents or women in making our determinations. An applicant's racial or ethnic background was considered as one factor in our general attempt to convert formal credentials into realistic predictions.

Each file to be reviewed by the full committee was first assigned and read by a committee member who reported on its contents to the committee. There followed a discussion on the applicants under consideration, leading to a committee vote on the disposition of the application. Assignment of files to the committee member for initial reading was usually on a random basis. The files of Black applicants, however, were assigned to and separately read by both Professor Geoffrey Crooks and Mr. Vincent Hayes, the two committee members thought best equipped to report to the full committee on the contents of the file. Professor Crooks worked with minority applications during the summer of 1970 as director of the school's Council on Legal Education Opportunities (CLEO) program[4] and Mr. Hayes, a second-year Black law student, who previously served as director of the Governor's Multi-Service Center in Seattle, a job involving considerable personnel evaluation. Applications of Chicanos, American Indians and Filipinos were reviewed by Associate Dean Robert S. Hunt for presentation to the committee.

In considering minority applicants, the committee was guided by a university-wide policy which sought to eliminate the continued effects of past segregation and discrimination against Blacks, Chicanos, American Indians and

---

[4] A federally (OEO) funded program, sponsored by the American Bar Association, the American Association of Law Schools, the National Bar Association and the Law School Admission Council, which provides summer training programs and financial assistance to disadvantaged college students seeking admission to law school.

other disadvantaged racial and ethnic minority groups. At trial, the President of the University of Washington testified as to the origin of this policy:

> More and more it became evident to us that just an open door, as it were, at the point of entry to the University, somehow or other seemed insufficient to deal with what was emerging as the greatest internal problem of the United States of America, a problem which obviously could not be resolved without some kind of contribution being made not only by the schools, but obviously, also, by the colleges in the University and the University of Washington, in particular, given the racial distribution of this state.
>
> . . .
>
> So that was the beginning of a growing awareness that just an open-door sheer equality in view of the cultural circumstances that produced something other than equality, was not enough; that some more positive contribution had to be made to the resolution of this problem in American life, and something had to be done by the University of Washington.

Thus, the university sought to achieve a reasonable representation within the student body of persons from these groups which have been historically suppressed by encouraging their enrollment within the various programs offered at the university. Policies for admission of minorities throughout the university recognized that the conventional "mechanical" credentializing system does not always produce good indicators of the full potential of such culturally separated or deprived individuals, and that to rely solely on such formal credentials could well result in unfairly denying to qualified minority persons the chance to pursue the educational opportunities available at the university.

The law school sought to carry forward this university policy in its admission program, not only to obtain a reasonable representation from minorities within its classes, but to increase participation within the legal profession by persons from racial and ethnic groups which have been historically denied access to the profession and which, consequently, are grossly underrepresented within the legal

system. In doing so, the admissions committee followed certain procedures which are the crux of plaintiff's claimed denial of equal protection of the laws.

First, in reviewing the files of minority applicants, the committee attached less weight to the PFYA in making a total judgmental evaluation as to the relative ability of the particular applicant to succeed in law school. Also, the chairman testified that although the same standard was applied to all applicants (*i.e.*, the relative probability of the individual succeeding in law school), minority applicants were directly compared to one another, but were not compared to applicants outside of the minority group. The committee sought to identify, within the minority category, those persons who had the highest probability of succeeding in law school. Thus, the law school included within its admitted group minority applicants whose PFYAs were lower than those of some other applicants, but whose entire record showed the committee that they were capable of successfully completing the law school program.[5]

As a result of this process, the committee admitted a group of minority applicants, placed a group of such applicants on a waiting list, and rejected other minority applications. The dean of the law school testified that the law school has no fixed admissions quota for minority students, but that the committee sought a reasonable representation of such groups in the law school. He added that the law school has accepted no unqualified minority applicants, but only those whose records indicated that they were capable of successfully completing the law school program.

The admissions committee sent letters of acceptance to over 200 applicants. Normal attrition among those invited was expected to reduce this group to produce a class of about 150. Against the possibility of unusually high attrition among the group of accepted applicants, the committee placed approximately 155 additional applicants on a wait-

---

[5]For example, many of the minority group applicants were first screened through special compensatory summer programs, operated primarily by CLEO.

ing list. The waiting list was ranked in approximate quartiles, with 46 applicants in the highest quartile, 38 applicants in the second quartile, 36 applicants in the third quartile, and 33 applicants in the fourth or lowest quartile. The remaining applicants—those receiving neither offers of acceptance nor waiting list assignments—received letters of denial. Plaintiff received an invitation to be placed on the waiting list and he was ranked in the fourth or lowest quartile. On July 21, 1971, the rate of attrition from the admitted applicants appearing to be within normal ranges, the committee decided to send letters of denial to those applicants in the third and fourth quartiles on the waiting list. Plaintiff was thus notified on August 2, 1971, that he was neither admitted nor any longer on the waiting list. As of August 1, 1971, 275 students were admitted to the freshman law school class and 55 students remained on the waiting list, making a total of 330 students.

Out of the 275 students given notice of admission, 127 were nonresidents of the state of Washington. Out of the 55 on the waiting list, 23 were nonresidents of the state of Washington. Thus, of the 330 applicants admitted or waiting, 180 were residents of the state of Washington. Ultimately, 32 nonresidents (21.6 percent of the entering class) actually enrolled in the first-year class.

Because of the judgmental factors in the admissions process, as outlined, the ultimate determination of applicants to whom admission was offered did not follow exactly the relative ranking of PFYAs. Of those invited, 74 had lower PFYAs than plaintiff; 36 of these were minority applicants, 22 were returning from military service, and 16 were applicants judged by the committee as deserving invitations on the basis of other information contained in their files. Twenty-nine applicants with higher PFYAs than plaintiff's were denied admission. Of the 36 minority group students invited 18 actually enrolled in the first-year class.

The trial court found that some minority applicants with college grades and LSAT scores so low that had they been

of the white race their applications would have been summarily denied, were given invitations for admission; that some such students were admitted instead of plaintiff; that since no more than 150 applicants were to be admitted to the law school, the admission of less qualified students resulted in a denial of places to those better qualified; and that plaintiff had better "qualifications" than many of the students admitted by the committee. The trial court also found that plaintiff was and is fully qualified and capable of satisfactorily attending the law school.

The trial court concluded that there is no constitutional restriction upon admitting nonresidential students; and no laws or regulations provide preference to residential students over nonresidential students for admission to the University of Washington School of Law; that, in denying plaintiff admission to the law school, the University of Washington discriminated against him and did not accord to him equal protection of the laws as guaranteed by the fourteenth amendment to the United States Constitution; and therefore, that plaintiff should be admitted to the law school for the class of 1974, beginning September 22, 1971.[6]

I.

We first consider defendants' threshold contention that the record establishes the law school would not have been able to accept him even if no minority students had been admitted; and, therefore, plaintiff has no standing to question the university's minorities admissions policy. Defendants argue that the committee's evaluation of plaintiff's qualifications led it to place him in the fourth, or lowest, quartile of the waiting list. This low ranking was wholly without regard to the school's minority admissions policy, but was based on a comparison of plaintiff's qualifications with those of other nonminority applicants. Thus, contend

---

[6]At time of oral argument in this court it was stated that plaintiff had actually been admitted to the law school in September, 1971, and was still in attendance. Due to the conditions under which plaintiff was admitted and the great public interest in the continuing issues raised by this appeal, we do not consider the case to be moot.

defendants, even if the minority group students had not been admitted, all of the seats they occupied would probably have been filled by others higher than plaintiff on the waiting list.

There is no way of knowing that plaintiff would have been admitted to the law school, even had no minority student been admitted. We do not agree, however, that for this reason plaintiff lacks standing to assert the constitutional questions presented herein. As noted by the United States Supreme Court in *Flast v. Cohen*, 392 U.S. 83, 99, 20 L. Ed. 2d 947, 88 S. Ct. 1942 (1968):

> The "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962).

We have heretofore made similar statements. In *State ex rel. Hays v. Wilson*, 17 Wn.2d 670, 137 P.2d 105 (1943), we stated that one seeking relief must show a clear legal or equitable right and a well-grounded fear of immediate invasion of that right. Further, in *State v. Human Relations Research Foundation*, 64 Wn.2d 262, 269, 391 P.2d 513 (1964), we stated:

> A litigant who challenges the constitutionality of a statute must claim infringement of an interest peculiar and personal to himself, as distinguished from a cause of dissatisfaction with the general framework of the statute.

Plaintiff's interest in this litigation clearly constitutes the requisite "personal stake in the outcome of the controversy" necessary to request an adjudication of the merits of this case.[7]

## II.

The essence of plaintiff's Fourteenth Amendment argument is that the law school violated his right to equal

---

[7] In reaching this conclusion we have also taken into consideration the university's urgent need for certainty in planning and administering its admissions policy.

protection of the laws by denying him admission, yet accepting certain minority applicants with lower PFYAs than plaintiff who, but for their minority status, would not have been admitted.[8]

To answer this contention we consider three implicit, subordinate questions: (A) whether race can ever be considered as one factor in the admissions policy of a state law school or whether racial classifications are *per se* unconstitutional because the equal protection of the laws requires that law school admissions be "color-blind"; (B) if consideration of race is not *per se* unconstitutional, what is the appropriate standard of review to be applied in determining the constitutionality of such a classification; and (C) when the appropriate standard is applied does the specific minority admissions policy employed by the law school pass constitutional muster?[9]

## A.

Relying solely on *Brown v. Board of Educ.*, 347 U.S. 483, 98 L. Ed. 873, 74 S. Ct. 686, 38 A.L.R.2d 1180 (1954), the trial court held that a state law school can never consider

---

[8]Our review is specifically limited to a consideration of the alleged constitutional infirmities in the law school's admissions policy and procedures. Beyond question, it would be inappropriate for this court to determine the actual composition of the first-year class through an independent evaluation of each applicant's file, substituting our criteria and judgment for those of the admissions committee. In regard to the scope of judicial review in this area, the United States Supreme Court has stated that:

> In seeking to define even in broad and general terms how far this remedial power extends it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults.

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 28 L. Ed. 2d 554, 91 S. Ct. 1267 (1971).

[9]Considering the statutory delegation of power to establish entrance requirements for students to the university, no serious question is raised as to whether the action of the law school here complained of constitutes "state action" within the meaning of the Fourteenth Amendment.

race as one criterion in its selection of first-year students. In holding that all such racial classifications are *per se* unconstitutional, the trial court stated in its oral opinion:

> Since no more than 150 applicants were to be admitted the admission of less qualified resulted in a denial of places to those otherwise qualified. The plaintiff and others in this group have not, in my opinion, been accorded equal protection of the laws guaranteed by the Fourteenth Amendment.
>
> In 1954 the United States Supreme Court decided that public education must be equally available to all regardless of race.
>
> After that decision the Fourteenth Amendment could no longer be stretched to accommodate the needs of any race. Policies of discrimination will inevitably lead to reprisals. In my opinion the only safe rule is to treat all races alike, and I feel that is what is required under the equal protection clause.

In *Brown v. Board of Educ., supra,* the Supreme Court addressed a question of primary importance at page 493:

> Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other "tangible" factors may be equal, deprive the children of the minority group of equal educational opportunities? We believe that it does.

The court in *Brown* held the equal protection clause of the Fourteenth Amendment prohibits state law from requiring the operation of racially segregated, dual school systems of public education and requires that the system be converted into a unitary, nonracially segregated system. In so holding, the court noted that segregation inevitably stigmatizes Black children:

> To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.

*Brown v. Board of Educ., supra* at 494. Moreover, "The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as

denoting the inferiority of the negro group." *Brown* at 494.

■ *Brown* did not hold that all racial classifications are *per se* unconstitutional; rather, it held that invidious racial classifications—*i.e.,* those that stigmatize a racial group with the stamp of inferiority—are unconstitutional. Even viewed in a light most favorable to plaintiff, the "preferential" minority admissions policy administered by the law school is clearly not a form of invidious discrimination. The goal of this policy is not to separate the races, but to bring them together. And, as has been observed,

> Preferential admissions do not represent a covert attempt to stigmatize the majority race as inferior; nor is it reasonable to expect that a possible effect of the extension of educational preferences to certain disadvantaged racial minorities will be to stigmatize whites.

O'Neil, *Preferential Admissions: Equalizing the Access of Minority Groups to Higher Education,* 80 Yale L.J. 699, 713 (1971).

While *Brown v. Board of Educ., supra,* certainly provides a starting point for our analysis of the instant case, we do not agree with the trial court that *Brown* is dispositive here. Subsequent decisions of the United States Supreme Court have made it clear that in some circumstances a racial criterion *may* be used—and indeed in some circumstances *must* be used—by public educational institutions in bringing about racial balance. School systems which were formerly segregated de jure[10] now have an affirmative duty to remedy racial imbalance.

In *Green v. County School Bd.,* 391 U.S. 430, 20 L. Ed. 2d 716, 88 S. Ct. 1689 (1968), the Supreme Court considered a

---

[10]"De jure" segregation generally refers to "segregation directly intended or mandated by law or otherwise issuing from an official racial classification," *Hobson v. Hansen,* 269 F. Supp. 401, 492 (D.D.C. 1967), *aff'd sub nom. Smuck v. Hobson,* 408 F.2d 175 (D.C. Cir. 1969), or, in other words, to segregation which has, or had, the sanction of law. In the context of public education the United States Supreme Court has expanded the meaning of the term "de jure segregation"

> [T]o comprehend any situation in which the activities of school authorities have had a racially discriminatory impact contributing to

school board's adoption of a "freedom-of-choice" plan which allowed a student to choose his own public school. No student was assigned or admitted to school on the basis of race. In holding that, on the facts presented, the plan did not satisfy the board's duty to create a unitary, nonracial system, the court stated at pages 437-40:

> In the context of the state-imposed segregated pattern of long standing, the fact that in 1965 the Board opened the doors of the former "white" school to Negro children and of the "Negro" school to white children merely begins, not ends, our inquiry whether the Board has taken steps adequate to abolish its dual, segregated system.
> . . . The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*.
> . . .
> As Judge Sobeloff has put it,
> " 'Freedom of choice' is not a sacred talisman; it is only a means to a constitutionally required end—the abolition of the system of segregation and its effects. If the means prove effective, it is acceptable, but if it fails to undo segregation, other means must be used to achieve this end. The school officials have the continuing duty to take whatever action may be necessary to create a 'unitary, nonracial system.' " *Bowman v. County School Board*, 382 F.2d 326, 333 (C. A. 4th Cir. 1967) (concurring opinion).

Pursuing this principle further, the Supreme Court in *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 28 L. Ed. 2d 554, 91 S. Ct. 1267 (1971), unanimously held that school authorities, in seeking to achieve a unitary, nonracial system of public education, need not be "color-

---

the establishment or continuation [of racial imbalance] . . . *State ex rel. Citizens Against Mandatory Bussing v. Brooks*, 80 Wn.2d 121, 130, 492 P.2d 536 (1972).

Where the segregation is inadvertent and without the assistance or collusion of school authorities, and is not caused by any "state action", but rather by social, economic and other determinants, it will be referred to as "de facto" herein. *See* Fiss, *Racial Imbalance in the Public Schools: the Constitutional Concepts*, 78 Harv. L. Rev. 564. 565-66, 584, 598 (1965).

blind", but may consider race as a valid criterion when considering admissions and producing a student body:

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court.

The Supreme Court then approved the district court's opinion requiring the school authorities to consider race in determining the composition of individual schools:

> As we said in *Green*, a school authority's remedial plan or a district court's remedial decree is to be judged by its effectiveness. Awareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional violations.

*Swann v. Charlotte-Mecklenburg Bd. of Educ., supra* at 25.

█ Thus, the constitution is color conscious to prevent the perpetuation of discrimination and to undo the effects of past segregation. In holding invalid North Carolina's anti-bussing law, which flatly forbade assignment of any student on account of race or for the purpose of creating a racial balance or ratio in the schools and which prohibited bussing for such purposes, the court stated:

> [T]he statute exploits an apparently neutral form to control school assignment plans by directing that they be "color blind"; that requirement, against the background of segregation, would render illusory the promise of *Brown v. Board of Education*, 347 U.S. 483 (1954). Just as the race of students must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy.

*North Carolina Bd. of Educ. v. Swann*, 402 U.S. 43, 45, 28 L. Ed. 2d 586, 91 S. Ct. 1284 (1971). *Accord, United States v. Jefferson County Bd. of Educ.*, 372 F.2d 836 (5th Cir. 1966),

*aff'd en banc*, 380 F.2d 385 (5th Cir. 1967), *cert. denied sub nom., Board of Educ. v. United States*, 389 U.S. 840, 19 L. Ed. 2d 104, 88 S. Ct. 77 (1967).

Clearly, consideration of race by school authorities does not violate the Fourteenth Amendment where the purpose is to bring together, rather than separate, the races. The "minority" admissions policy of the law school, aimed at insuring a reasonable representation of minority persons in the student body, is not invidious. Consideration of race is permissible to carry out the mandate of *Brown*, and, as noted, has been required in some circumstances.

■■ However, plaintiff contends that cases such as *Green v. County School Bd., supra*, and *Swann v. Charlotte-Mecklenburg Bd. of Educ., supra*, are inapposite here since none of the students there involved were deprived of an education by the plan to achieve a unitary school system. It is questionable whether defendants deprived plaintiff of a legal education by denying him admission.[11] But even accepting this contention, arguendo, the denial of a "benefit" on the basis of race is not necessarily a *per se* violation of the Fourteenth Amendment, if the racial classification is used in a compensatory way to promote integration.

For example, in *Porcelli v. Titus*, 431 F.2d 1254 (3d Cir. 1970), *cert. denied*, 402 U.S. 944, 29 L. Ed. 2d 112, 91 S. Ct. 1612 (1971), a group of white teachers alleged that the school board had bypassed them in abolishing the regular promotion schedule and procedure for selecting principals and vice-principals, and had given priority to Black candidates in order to increase the integration of the system's faculty. In upholding the board's judgment to suspend the ordinary promotion system upon racial considerations, the court stated:

State action based partly on considerations of color, when

---

[11]Plaintiff alleged in his complaint that he had previously applied to and been accepted by the law school at each of the following universities: University of Oregon, University of Idaho, Gonzaga University and Willamette University.

color is not used per se, and in furtherance of a proper governmental objective, is not necessarily a violation of the Fourteenth Amendment.

*Porcelli v. Titus, supra* at 1257.

Similarly, the eighth circuit concluded that in order to eradicate the effects of past discrimination,

> [I]t would be in order for the district court to mandate that one out of every three persons hired by the [Minneapolis] Fire Department would be a minority individual who qualifies until at least 20 minority persons have been so hired.

*Carter v. Gallagher,* 452 F.2d 315, 331 (8th Cir. 1971), *cert. denied,* 406 U.S. 950 (1972). Thus, the court ordered the department to hire minority applicants, although in doing so a more qualified nonminority applicant might be bypassed. *Cf. Contractors Ass'n v. Secretary of Labor,* 442 F.2d 159 (3d Cir. 1971), *cert. denied,* 404 U.S. 854 (1971).

■ We conclude that the consideration of race as a factor in the admissions policy of a state law school is not a *per se* violation of the equal protection clause of the Fourteenth Amendment. We proceed, therefore, to the question of what standard of review is appropriate to determine the constitutionality of such a classification.

B.

■ Generally, when reviewing a state-created classification alleged to be in violation of the equal protection clause of the Fourteenth Amendment, the question is whether the classification is reasonably related to a legitimate public purpose. And, in applying this "rational basis" test "[A] discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland,* 366 U.S. 420, 426, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961).

However, where the classification is based upon race, a heavier burden of justification is imposed upon the state. In overturning Virginia's antimiscegenation law, the Supreme Court explained this stricter standard of review:

The clear and central purpose of the Fourteenth Amend-

ment was to eliminate all official state sources of invidious racial discrimination in the States. [Citations omitted.]

. . . At the very least, the Equal Protection Clause demands that racial classifications, especially suspect in criminal statutes, be subjected to the "most rigid scrutiny," [citation omitted] and, if they are ever to be upheld, they must be shown to be necessary to the accomplishment of some permissible state objective, independent of the racial discrimination which it was the object of the Fourteenth Amendment to eliminate. . . .

There is patently no legitimate overriding purpose independent of invidious racial discrimination which justifies this classification.

*Loving v. Virginia,* 388 U.S. 1, 10-11, 18 L. Ed. 2d 1010, 87 S. Ct. 1817 (1967). *Accord, McLaughlin v. Florida,* 379 U.S. 184, 13 L. Ed. 2d 222, 85 S. Ct. 283 (1964); *Hunter v. Erickson,* 393 U.S. 385, 21 L. Ed. 2d 616, 89 S. Ct. 557 (1969).

It has been suggested that the less strict "rational basis" test should be applied to the consideration of race here, since the racial distinction is being used to redress the effects of past discrimination; thus, because the persons normally stigmatized by racial classifications are being benefited, the action complained of should be considered "benign" and reviewed under the more permissive standard. However, the minority admissions policy is certainly not benign with respect to nonminority students who are displaced by it. *See* O'Neil, *Preferential Admissions: Equalizing the Access of Minority Groups to Higher Education,* 80 Yale L.J. 699, 710 (1971).

The burden is upon the law school to show that its consideration of race in admitting students is necessary to the accomplishment of a compelling state interest.

C.

[7] It can hardly be gainsaid that the minorities have been, and are, grossly underrepresented in the law schools —and consequently in the legal profession—of this state

and this nation.[12] We believe the state has an overriding interest in promoting integration in public education. In light of the serious underrepresentation of minority groups in the law schools, and considering that minority groups participate on an equal basis in the tax support of the law school, we find the state interest in eliminating racial imbalance within public legal education to be compelling.

Plaintiff contends, however, that any discrimination in this case has been de facto, rather than de jure. Thus, reasons plaintiff, since the law school itself has not actively discriminated against minority applicants, it may not attempt to remedy racial imbalance in the law school student body, and, consequently, throughout the legal profession. We disagree.

In *State ex rel. Citizens Against Mandatory Bussing v. Brooks,* 80 Wn.2d 121, 128, 492 P.2d 536 (1972), we held that whether the nature of segregation is de jure or de facto is of no consequence where a voluntary plan of eliminating racial imbalance is adopted by school officials:

Reason impels the conclusion that, if the constitution supports court directed mandatory bussing to desegre-

---

[12]Report of Black Lawyers and Judges in the United States, 1960-70, 91st Cong., 2d Sess., 116 Cong. Rec. 30786 (1970); U.S. Dep't of Commerce, Bureau of Census, General Population Characteristics of the State of Washington, Tables 17 and 18 (1970); Office of Program Planning and Fiscal Management of the State of Washington, Pocket Data Book (1971); Rosen, *Equalizing Access to Legal Education: Special Programs for Law Students Who Are Not Admissible by Traditional Criteria,* 1970 U. Tol. L. Rev. 321 (1970); Edwards, *A New Role for the Black Law Graduates—A Reality or an Illusion?* 69 Mich. L. Rev. 1407 (1971); Gelhorn, *The Law Schools and the Negro,* 1968 Duke L.J. 1069 (1968); Reynoso, *Laraza, the Law and the Law Schools,* 1970 U. Tol. L. Rev. 809 (1970); Toles, *Black Population and Black Judges,* 17 Student Lawyer J. 20 (Feb. 1972); O'Neil, *Preferential Admissions: Equalizing Access to Legal Education,* 1970 U. Tol. L. Rev. 281 (1970); Atwood, *Survey of Black Law Student Enrollment,* 16 Student Lawyer J. 18 (June 1971); Comment, *Selected Bibliography: Minority Group Participation in the Legal Profession,* 1970 U. Tol. L. Rev. 935 (1970).

In relying on statistical evidence to establish the underrepresentation of minority groups in the legal profession, defendants are supported by ample precedent. *See, e.g., Hobson v. Hansen, supra* note 10.

gate schools in a system which is dual "de jure," then such bussing is within the appropriate exercise of the discretion of school authorities in a system which is dual "de facto."

This conclusion is supported by the reasoning of the district court in *Barksdale v. Springfield School Comm.*, 237 F. Supp. 543, 546 (D. Mass. 1965), *vacated on other grounds,* 348 F.2d 261 (1st Cir. 1965):

It is neither just nor sensible to proscribe segregation having its basis in affirmative state action while at the same time failing to provide a remedy for segregation which grows out of discrimination in housing, or other economic or social factors.

█ Significantly, this case does not present for review a court order imposing a program of desegregation. Rather, the minority admissions policy is a voluntary plan initiated by school authorities. Therefore, the question before us is not whether the Fourteenth Amendment *requires* the law school to take affirmative action to eliminate the continuing effects of de facto segregation; the question is whether the constitution *permits* the law school to remedy racial imbalance through its minority admissions policy. In refusing to enjoin school officials from implementing a plan to eradicate de facto school segregation by the use of explicit racial classifications, the second circuit observed: "That there may be no constitutional duty to act to undo de facto segregation, however, does not mean that such action is unconstitutional." *Offermann v. Nitkowski,* 378 F.2d 22, 24 (2d Cir. 1967).

The de jure-de facto distinction is not controlling in determining the constitutionality of the minority admissions policy voluntarily adopted by the law school.[13] Further, we see no reason why the state interest in eradicating the continuing effects of past racial discrimination is less

---

[13]We do not, therefore, reach the question of whether there is an inherent cultural bias in the Law School Admission Test, or in the methods of teaching and testing employed by the law school, which perpetuates racial imbalance to such an extent as to constitute de jure segregation.

merely because the law school itself may have previously been neutral in the matter.

The state also has an overriding interest in providing *all* law students with a legal education that will adequately prepare them to deal with the societal problems which will confront them upon graduation. As the Supreme Court has observed, this cannot be done through books alone:

> [A]lthough the law is a highly learned profession, we are well aware that it is an intensely practical one. The law school, the proving ground for legal learning and practice, cannot be effective in isolation from the individuals and institutions with which the law interacts. Few students and no one who has practiced law would choose to study in an academic vacuum, removed from the interplay of ideas and the exchange of views with which the law is concerned.

*Sweatt v. Painter,* 339 U.S. 629, 634, 94 L. Ed. 1114, 70 S. Ct. 848 (1950).

The legal profession plays a critical role in the policy making sector of our society, whether decisions be public or private, state or local. That lawyers, in making and influencing these decisions, should be cognizant of the views, needs and demands of all segments of society is a principle beyond dispute. The educational interest of the state in producing a racially balanced student body at the law school is compelling.

Finally, the shortage of minority attorneys—and, consequently, minority prosecutors, judges and public officials —constitutes an undeniably compelling state interest.[14] If minorities are to live within the rule of law, they must enjoy equal representation within our legal system.

Once a constitutionally valid state interest has been established, it remains for the state to show the requisite connection between the racial classification employed and that interest. The consideration of race in the law school admissions policy meets the test of necessity

---

[14]*See* O'Neil, *Preferential Admissions: Equalizing Access to Legal Education, supra* note 12.

here because racial imbalance in the law school and the legal profession is the evil to be corrected, and it can only be corrected by providing legal education to those minority groups which have been previously deprived.

It has been suggested that the minority admissions policy is not necessary, since the same objective could be accomplished by improving the elementary and secondary education of minority students to a point where they could secure equal representation in law schools through direct competition with nonminority applicants on the basis of the same academic criteria. This would be highly desirable, but 18 years have passed since the decision in *Brown v. Board of Educ.*, 347 U.S. 483, 98 L. Ed. 873, 74 S. Ct. 686, 38 A.L.R.2d 1180, and minority groups are still grossly underrepresented in law schools. If the law school is forbidden from taking affirmative action, this underrepresentation may be perpetuated indefinitely. No less restrictive means would serve the governmental interest here; we believe the minority admissions policy of the law school to be the only feasible "plan that promises realistically to work, and promises realistically to work *now.*" *Green v. County School Bd.*, 391 U.S. 430, 20 L. Ed. 2d 716, 88 S. Ct. 1689 (1968) at 439.

We conclude that defendants have shown the necessity of the racial classification herein to the accomplishment of an overriding state interest, and have thus sustained the heavy burden imposed upon them under the equal protection provision of the Fourteenth Amendment.

■ There remains a further question as to the scope of the classification. A validly drawn classification is one "which includes all [and only those] persons who are similarly situated with respect to the purpose of the law." Tussman & tenBroek, *The Equal Protection of the Laws*, 37 Calif. L. Rev. 341, 346 (1949). The classification used by defendants does not include all racial minorities, but only four (Blacks, Chicanos, Indians and Philippine Americans). However, the purpose of the racial classification here is to give special consideration to those racial minority groups

which are underrepresented in the law schools and legal profession, and which cannot secure proportionate representation if strictly subjected to the standardized mathematical criteria for admission to the law school.

In selecting minority groups for special consideration, the law school sought to identify those groups most in need of help. The chairman of the admissions committee testified that Asian American, *e.g.*, were not treated as minority applicants for admissions purposes since a significant number could be admitted on the same basis as general applicants. In light of the purpose of the minority admissions policy, the racial classification need not include all racial minority groups.[15] The state may identify and correct the most serious examples of racial imbalance, even though in so doing it does not provide an immediate solution to the entire problem of equal representation within the legal system.

We hold that the minority admissions policy of the law school, and the denial by the law school of admission to plaintiff, violate neither the equal protection clause of the fourteenth amendment to the United States Constitution nor article 1, section 12 of the Washington State Constitution.[16]

## III.

Apart from his equal protection argument, plaintiff contends that the procedures employed by the law school in selecting first-year students constitute arbitrary and capricious administrative action, and that the law school's denial of admission to plaintiff pursuant to these procedures must be set aside.

We recently reaffirmed our long-standing test of arbitrary and capricious action:

[15]*See* O'Neil, *Preferential Admissions: Equalizing the Access of Minority Groups to Higher Education,* 80 Yale L.J. 699, 750 (1971).

[16]As we have held, the equal protection clause of U.S. Const. amend. 14, and the privileges and immunities clause of Const. art. 1, § 12, have the same import, and we apply them as one. *Markham Adv. Co. v. State,* 73 Wn.2d 405, 427, 439 P.2d 248 (1968), *appeal dismissed,* 393 U.S. 316 (1969).

Arbitrary and capricious action of administrative bodies means willful and unreasoning action, without consideration and in disregard of facts or circumstances. Where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached.

*DuPont-Fort Lewis School Dist. 7 v. Bruno,* 79 Wn.2d 736, 739, 489 P.2d 171 (1971). Plaintiff must carry the burden of proof on this issue. *State ex rel. Longview Fire Fighters, Local 828 v. Longview,* 65 Wn.2d 568, 572, 399 P.2d 1 (1965).

In determining whether the denial of plaintiff's application to the law school constitutes arbitrary and capricious action, we turn first to the ultimate admissions goals of the law school, pursuant to which the policy and procedures of the admissions committee have been formulated. In light of the tremendous increase in the number of qualified applicants, the law school sought to identify applicants with the potential for outstanding performance in the law school, and then "to select applicants for admission from that group on the basis of their ability to make significant contributions to law school classes and to the community at large." The guide for applicants also stated that the criteria to be applied by the law school in the selection process would not be limited to numerical indicators such as test scores and grade point averages, but would also include several other factors requiring the exercise of judgmental evaluation. Among these other factors were recommendations, the quality of work in difficult analytical seminars and writing programs, the academic standards of the applicant's undergraduate school, and the nature of the applicant's graduate work or employment (if any) since graduation. The guide added that race would be considered as one factor in the law school's attempt to convert formal credentials into realistic predictions.

Plaintiff first contends that no standards were applied by the committee in its evaluation of these criteria for admis-

sion. However, the trial court specifically refused to make a finding of fact proposed by plaintiff that:

[T]he Admissions Committee selected and denied students for admission to the University of Washington School of Law with no set standards or procedures.

We particularly note that while race was a major factor, it was not the only factor considered by the committee in reviewing minority applications. No minority quota was established; rather, a reasonable representation of such groups in the law school was sought. Also, the dean of the law school testified (and the trial court did not find otherwise) that only "qualified" minority applicants were admitted—i.e., minority persons whose entire record showed the committee that they were capable of successfully completing the law school program. Many minority applicants were denied admission. The trial court did find that some minority students admitted would have been summarily denied had they been white, since their predicted first-year averages were relatively low. Also, the court found that some minority students were admitted with "lower qualifications" than plaintiff. Thus, the record overwhelmingly indicates that the admissions committee did employ predetermined standards and procedures in selecting students.

Plaintiff further contends that the committee failed to consider all applicants on the same basis, but instead judged minority applicants by different standards. In reviewing the files of applicants, the committee did ask the same fundamental question in every case: what is the relative probability of the individual succeeding in law school and making significant contributions to law school classes and the community at large? However, minority applicants were directly compared to one another under this test, but were not compared to nonminority applicants.

The question thus raised is whether, in selecting those applicants most likely to make significant contributions to law school classes and to the community at large, it is arbitrary and capricious for the admissions committee to

consider race as a factor in admitting qualified minority applicants whose strict academic credentials yield a lower PFYA than that of some nonminority applicants who are not admitted. The answer depends on whether race is relevant to the goals of the law school's admissions program as stated in the guide for applicants.

The thrust of plaintiff's objection here is that the action of the committee was arbitrary because, in admitting students, it deviated from the relative numerical ranking provided by the PFYAs. Thus, argues plaintiff, by taking subjective (*i.e.*, nonmathematical) factors into consideration, and weighting them differently for different applicants, the committee arbitrarily denied him admission. We do not agree that the exercise of judgment in evaluating an applicant's file constitutes arbitrary and capricious action. Nor do we find an abuse of that judgment here.

The president of the university testified that the decision to consider race in interpreting a minority applicant's numerical grade averages and test scores was reached because of the opinion within the university that such standardized indicators inherently exclude a disproportionate number of minority applicants.

> [We] recognize the conventional standards that have been used with regard to most students are even less reliable in dealing with students who come from culturally deprived backgrounds. I do not think this means reducing the standards. It admits that the conventional standards are not good indicators and that something more is needed.
>
> . . .
>
> . . . by paying more attention to evidence obtained by the background of the individual and from all kinds of evidence that could be adduced . . . the judgment could be made as to whether or not this particular individual seemed to have greater potential than would be indicated if they were to rely entirely on the mechanical standards.

"Basic intelligence must have the means of articulation to manifest itself fairly in a testing process." *Griggs v.*

*Duke Power Co.*, 401 U.S. 424, 430, 28 L. Ed. 2d 158, 91 S. Ct. 849 (1971). We express no opinion as to whether the LSAT bears a cultural bias which renders the test less reliable as a predictor of law school performance for minority students than for others. But this is certainly a factor which the law school may consider in its discretion. *See Hobson v. Hansen*, 269 F. Supp. 401, 484 (D.D.C. 1967); O'Neil, *Preferential Admissions: Equalizing Access to Legal Education*, 1970 U. Tol. L. Rev. 281, 303 (1970). It would be unnecessary, of course, for the law school to consider race in interpreting the standardized numerical indicators for nonminority students, because the alleged bias operates *in favor* of those applicants.

The fallacy of plaintiff's argument is the assumption that, but for the special consideration given minority applicants, selection decisions by the committee would have been based solely upon objective, measureable mathematical projections of the academic performance of applicants. Actually, although the PFYA was a very important factor, it was not the sole determinative factor for any group of students. Rather, the committee utilized the PFYA as a starting point in making its judgment as to the fundamental criterion for admission: the applicant's potential for contributing to law school classes and to the community. That the committee considered more than the standardized numerical indicators in reviewing the files of all students is indicated by the fact that 16 *non*minority, general applicants were admitted with lower PFYAs than plaintiff.

Moreover, we question the assumption that a minority applicant is ipso facto "less qualified" than a nonminority applicant who has a higher predicted first-year average. When judging "qualifications," the primary criterion of the law school in admitting students must be remembered. In light of the gross underrepresentation of minorities in the legal system, can it be said with such certainty as to leave no room for differing opinions that a white applicant with a higher PFYA will make a greater contribution to the law school and the community? We think not. While the proba-

bility of applicant achieving high grades in his first year of law school is an important criterion for admission, it is not the sole permissible criterion.

 Where the criteria for admissions are not arbitrary and capricious, we will not vitiate the judgment of the admissions committee unless a constitutional violation is shown. Considering the debatable nature of the criteria, we do not find the consideration of race in the admission of those minority applicants who indicate competence to successfully complete the law school program to be arbitrary and capricious. Law school admissions need not become a game of numbers; the process should remain sensitive and flexible, with room for informed judgment in interpreting mechanical indicators. The committee may consider the racial or ethnic background of an applicant when interpreting his standardized grades and test scores.

As a final point, plaintiff argues that the consideration of race here was arbitrary because no inquiry was made into the background of each minority applicant to make certain that the individual was in fact educationally, economically and culturally deprived. However, the mere fact that a minority applicant comes from a relatively more affluent home does not mean that he has not been subjected to psychological harm through discrimination. *See Hobson v. Hansen, supra* at 482. Likewise, every minority lawyer is critically needed, whether he be rich or poor. A showing of actual deprivation is unnecessary for the accomplishment of the compelling state interests here.[17]

Plaintiff has failed to show that the policy and procedures of the law school in denying him admission were so unreasoned and in disregard of the facts and circumstances as to constitute arbitrary and capricious action.

## IV.

Plaintiff also contends that article 9, section 1 of the Washington State Constitution[18] and certain of the statutes

---

[17]*See generally* O'Neil, *Preferential Admissions: Equalizing the Access of Minority Groups to Higher Education, supra* at 751.

[18]Art. 9 "§ 1 PREAMBLE. It is the paramount duty of the state to

governing the University of Washington[19] require prefer- ence to be given Washington residents over nonresidents in admission to the school of law, and that in failing to give this preference to plaintiff, the law school wrongfully de- nied him admission. The trial court ruled against plaintiff's contention on this issue. We agree with the trial court.

■ Article 9 does not apply to the University of Washington, *Litchman v. Shannon*, 90 Wash. 186, 155 P. 783 (1916), but is addressed only to the "common schools." (Article 9, section 2.) *See, e.g., Edmonds School Dist. 15 v. Mountlake Terrace*, 77 Wn.2d 609, 611, 465 P.2d 177 (1970); *Newman v. Schlarb*, 184 Wash. 147, 152-54, 50 P.2d 36 (1935); *State ex rel. School Dist. 37 v. Clark County*, 177 Wash. 314, 321, 31 P.2d 897 (1934); *Litchman v. Shannon, supra* at 191. Thus, article 9 does not call for preferential admission treatment of residents over nonresidents at the law school.

Nor do the statutory provisions cited by plaintiff dic- tate the contrary. Although these provisions differen- tiate residents from nonresidents for various purposes (such as qualifying for state aid, RCW 28B.10.800) they cannot be read for the sweeping purpose desired by plain- tiff. The only preferential treatment clearly stated is in RCW 28B.15.200, in which the legislature has prescribed a higher fee for nonresidents than residents for enrollment at the University of Washington. This fee undoubtedly affects the ratio of nonresidents to residents actually enrolled within the law school.[20] However, this fee provision is the only statutory indication of preference; any further limita-

---

make ample provision for the education of all children residing within its borders . . . ."

[19]RCW 28B.20.020, 28B.15.011, *et seq.*, and 28B.10.800.

[20]"Out of the 275 students admitted to the law school's first-year class for the 1971-72 school year, 127 were nonresidents. However, only 32 nonresidents (21.6 percent of the entering class) actually enrolled. As the trial court noted, this high attrition rate (74.8 percent) tends to indicate that the substantially higher fees for nonresidents significantly affect the percentage of nonresident students in the law school.

tions upon the admission of nonresidents to the law school are controlled by the Board of Regents, who shall "Establish entrance requirements for students seeking admission to the university." RCW 28B.20.130(3). We hold that the university is not required to give admission preference to residents of the state of Washington.

The judgment of the trial court is reversed.

The foregoing opinion was prepared by Justice Marshall A. Neill while a member of this court. It is adopted by the undersigned as the opinion of the court.

FINLEY, HAMILTON, STAFFORD, WRIGHT, and UTTER, JJ., and TUTTLE, J. Pro Tem.

WRIGHT, J. (concurring)—I have signed the majority opinion because I agree with the result. A law school admissions program should not and need not be based upon purely mathematical factors.

In many human activities and particularly in the activities of every branch and level of government there must be a careful balancing to insure on the one hand impartiality, honesty and integrity and on the other hand reasonable exercise of discretion and judgment.

In the case of law school admissions, the problem is highly complex for several reasons. We are here concerned with the academic year starting in the fall of 1971. For that year, it was possible to admit into the first-year class of the law school not more than 150 students. There were 1,601 applicants, most of whom were qualified and could have been admitted except for the need to limit the size of the class.

Of course, the easy way would be to devise a purely mathematical formula for admissions and then apply it inflexibly. That, however, might not produce the best results. It is a matter in which the administration of the university and of the law school should exercise some discretion. Certainly there is enough intelligence, experience and common sense within the admissions committee to properly exercise its discretion.

My primary reason for writing this brief concurring opinion is to point out the desirability of more complete published standards for admission. The publication of such standards would insure not only the complete fairness of the process, but also the appearance of fairness.

FINLEY and STAFFORD, JJ., concur with WRIGHT, J.

HALE, C.J. (dissenting)—Racial bigotry, prejudice and intolerance will never be ended by exalting the political rights of one group or class over those of another. The circle of inequality cannot be broken by shifting the inequities from one man to his neighbor. To aggrandize the first will, to the extent of the aggrandizement, diminish the latter. There is no remedy at law except to abolish all class distinctions heretofore existing in law. For that reason, the constitutions are, and ever ought to be, color blind. Now the court says it would hold the constitutions color conscious that they may stay color blind. I do not see how they can be both color blind and color conscious at the same time toward the same persons and on the same issues, so I dissent.

The court, as I see it, upholds palpably discriminatory law school admission practices of the state university mainly because they were initiated for the laudable purpose of enhancing the opportunities of members of what are described as "ethnic minorities." It thus suggests a new rule of constitutional interpretation to be applied here that, if the administrative intentions are adequately noble in purpose, Mr. DeFunis may be deprived of equal protection of the laws and certain special immunities and privileges may be granted to others which, on the same terms, are denied to him. One should keep in mind the wisdom of the old saying that the road to perdition is paved with good intentions.

The court holds that the university law school may give preferential treatment to persons who come from groups "which have been historically suppressed by encouraging their enrollment within the various programs offered at the

University." But what seems to me to be a flagrant departure from the constitutions, ignored by the court, is epitomized in the statement that the admission policy was adopted by the law school "to increase participation within the legal profession by persons from racial and ethnic groups which have been historically denied access to the profession and which, consequently, are grossly underrepresented within the legal system." This assertion confesses to prior racial discrimination which I doubt existed, and fails to recognize, in a case where the demand for seats in the law school is much greater than the school's capacity, that the increased minority participation assured by such admission procedures inevitably produces a correlative denial of access to nonminority applicants.

Thus, in keeping with what may be described as the expanding horizons of latter-day constitutional principles in perpetual processes of invention and assertion, the court discovers in an administrative agency of the state the power to determine, first, who, among the applicants, shall be classified as Black Americans, Chicano Americans, American Indians and Philippine Americans and, then, a concomitant power to exclude all other ethnic minorities, including Asian Americans, from the preferred classification. It lets the agency grant preferences—or as they more accurately should be described, indulgences—accordingly. For reasons not clear in the record, Asian Americans and all others of different ethnic derivation than those enumerated are not included among those to receive such preferences or indulgences.

Parenthetically, the record reveals, to me at least, another invidious form of discrimination—that against the residents of this state. According to some members of the admissions committee, the school has a goal to become a "national" law school, that is, one of nationally recognized prestige and purpose. In pursuance of this goal, the committee declines to discriminate against residents of other states and foreign countries. It is something of a mystery, however, how that goal can be achieved by the substantial

lowering of academic standards for admission. In trying to create a national law school by means of procedures now in vogue, the law school must inevitably indulge in what might be deemed an inverse form of discrimination against bona fide residents of the state because the policies of admission operate to deny to residents of the state those preferences which are due them. The admissions committee gives little or no heed to whether the applicant comes from within the state or out of the state and declines to observe an overt policy of affording preference to residents of the state of Washington as required by law and public policy. Although not so intended, the failure to honor that peculiar but logical preference which the university should accord to the people who live here ipso facto generates an inverse discrimination against them.

When one considers the numerical ratio of nonresidents to state residents in a nation as large as ours, this practice, if maintained over a period of years, while conceivably operating to transform the law school into a national law school, may, except for purposes of providing the tax money to keep it operating, keep it from functioning as a state university. Nowhere, constitutional principles aside, can I find that the legislature has ever conferred such sweeping powers upon the administration or faculty of the university. Thus, in admitting out-of-state students with low academic credentials at the expense of residents of this state with high academic records, the law school not only has violated the constitutions but at the same time has both discriminated against the youth of this state and repudiated a fundamental idea that a great university, if it stands for anything at all, must stand for academic excellence.

Mr. DeFunis supported his application for admission with every conceivable evidence of competence except possibly an astrological horoscope. The record shows that his parents had been residents of and taxpayers to the state for about 50 years, and that he had lived here all of his life, graduating from Franklin High School in Seattle. His ad-

mission files showed, and the court found as a specific fact, that he had been graduated from the University of Washington with an overall grade average of 3.62 out of a possible 4, and a junior-senior grade point average as calculated by the law school of 3.71, which would be 3.8 if 9 hours of straight A (4) in Latin earned in the first quarter of his junior year during the summer quarter, 1968, were included. Although a straight A in Latin may speak for little in the current techniques for evaluating law school applicants, one can be sure that John Marshall, Oliver Wendell Holmes, Joseph Story, Benjamin N. Cardozo and John Harlan, along with Thomas Jefferson, Abraham Lincoln and Franklin Delano Roosevelt, would have found it impressive.

Mr. DeFunis was refused enrollment not once but twice by the school of law. He first applied for and was denied admission by the entering law class in the fall of 1970, but was informed that he had a better chance of being admitted to the beginning law class the next year, in the fall of 1971. During that interval, while waiting for the latter class, he worked nearly 40 hours per week for the Seattle Park Department and at the same time earned 21 hours of straight A in graduate school, receiving also 3 hours of incomplete. His LSAT, or law school aptitude test scores, for tests taken on three separate occasions, were 512 and 566 in 1969, and a quite remarkable 668 in December, 1970. The 668 score placed in the top 7 percent of all law school applicants nationally computed during a 3-year test period. Even if the scores were averaged, as the testing service suggests should be done, that average of 582, along with his grade average, placed him in the category of those marked for admission. His predicted first-year average (PFYA)— calculated by formula applied to his junior-senior grade point average of 3.71 and his averaged three LSAT scores along with his average writing test score of 61—gave him a predicted score of 76.23. By all standards and requirements of the admission policies openly announced by the law school, he should have been admitted.

The way things worked out, however, the law school failed to apply even its own vague, loose and whimsical admission standards. Of the approximately 155 enrolled in the entering law class in the fall of 1971, 29 had higher PFYAs than Mr. DeFunis, but there were 74, including minority students, with lower PFYAs. Excluding Asians, 18 of the 36 minority students with lower PFYAs than Mr. DeFunis actually did enroll; the other 18 notified of their admission, also with lower PFYAs than plaintiff, for reasons not discernible in the record did not enroll.

Altogether, 275 applicants were given formal notice of acceptance into the class entering in the fall of 1971 and another 55 were put on a waiting list making a total of 330 students who were formally accepted or notified that they probably would be. The reason for giving notice of acceptance to 275 for a class which was limited to 155 is that usually many applicants apply to several schools; others, for one reason or another, are unable or disinclined to enroll. Plaintiff Marc DeFunis, Jr., was neither among the 275 notified of acceptance nor among those added to the waiting list of 55.

The discriminatory action in refusing his admission becomes even more glaring when an overall view is taken of the admission practices. Of the 275 students who were explicitly told they had been accepted to the entering 1971 fall class, 180 had lower junior-senior grade point averages than plaintiff DeFunis and only 95 had higher. Of 330 accepted for admission, which included those notified of admission and the additional 55 placed on a waiting list, 224 had lower junior-senior grade point averages and only 106 had a better average—and this without allowing for the 9 hours of A in Latin he had received in his junior year. Among the 275 admitted, 44 were minority, i.e., Afro-American, Philippine American, Chicano or American Indian, and of these 44 minority admitted, only 6 had higher academic qualifications than Mr. DeFunis and 38 had lower qualifications. Among these latter admitted students with

50

lower qualifications were some whose college grades and aptitude scores were so low that, had they not been minority students, their applications would have been summarily denied.

Although preference was shown students from the so-called minority groups, no preference whatever was shown on the basis of Washington residency. Of the 275 admitted (excluding the waiting list of 55), 127 were nonresidents—a curious departure from the obvious public policy for which the university was established and has been primarily maintained for over a century, the education of the people of this state. To ignore bona fide state residence appears to be incompatible with the declared policy expressed in Const. art. 9, § 1, that it is the paramount duty of the state to educate children within its borders, as implemented by early legislation (preceding RCW 28B.20.020), that, with limited exceptions, *tuition* at the university *shall be free to all bona fide residents of the state.* (Formerly RCW 28.77.020.) Although now by statute the university must charge tuition to state residents (RCW 28B.15.200), this does not alter the obvious long-existing policy of affording preference to residents of this state. This existing statute recognizes this preference in the assessment of higher tuition charges to nonresidents than to residents. Although the statutes authorize certain discretionary powers in the Board of Regents to admit nonresidents and require disparate tuition fees from both state residents and out-of-state residents, the traditional policy of preference to bona fide residents for admission to the state's institutions of higher learning remains intact. The one idea clearly emerging from the constitution and statutes affecting higher education in the state's own colleges is that the people of the territory and state founded and have since maintained and supported a state university primarily for the benefit of those who live here.

Mr. DeFunis' case presents the curious situation of a state university school of law founded, maintained and operated by the people of this state and deriving most of its

subsistence from their taxes and good will, designed to enable them and their children to obtain a professional education which a substantial number of them could not afford were they studying in a private school, inviting the nation at large to compete for seats in the law school, and then not awarding the seats to the winners of the competition. I think it not a narrow provincialism to say that, by and large, the major resources of the state university should be devoted to the purpose for which it was created and has been maintained—service not only to mankind at large but additionally and primarily to the people of the commonwealth who founded and perpetually have supported it. Nonresident students should, of course, be admitted, but their numbers ought to be limited and their admission selective and probably based on reciprocal policies of the other states and foreign countries. Admission of out-of-state residents should be in consonance with the principle that a state university exists primarily for the people of the state and secondarily for residents of other states and foreign countries.

The law faculty was, as the court observes, motivated by a laudable purpose—to increase the number of minority students studying law and with the avowed purpose of equalizing opportunities among applicants who come from the lower income and economic groups with those who come from the higher. This policy of ethnic minority selection apparently was not to apply to faculty positions for the record does not show that any qualified nonminority applicant for the teaching staff was refused nor any faculty member ousted to make room for law teachers with questionable credentials from a minority ethnic group.

In deciding which particular groups should be classified as ethnic minorities, the committee on admissions first made an assumption supported by no evidence whatever, i.e., that all of the accepted minority students except Asian Americans were of a lower economic status than Mr. DeFunis. No comparative investigation or study as to the fi-

nancial condition or economic background was made to establish the relative economic and cultural condition of the students applying. It was thus categorically assumed that the ethnic minority applicants were, to use the descriptive term current in academic circles, culturally deprived—meaning, one must suppose, that the environmental factors surrounding a minority student and tending to affect his academic achievements were of a lower order than those surrounding white or majority students. This sweeping and unsupported assumption, derived from no real evidence whatever, that all of the admitted minority students were both poor and culturally deprived, supplied the modus vivendi for the scheme of preferences. It ignored the correlative assumption which inevitably had to be made that neither Mr. DeFunis nor any of the nonminority applicants had been equally culturally or economically deprived.

Aside from the questions of equal protection and the granting of special privileges and immunities, there arises from this record a compelling but subsidiary question as to how such bizarre results came about. How, under any rational admissions policy, could an outstanding student, one of superb academic achievement, be denied admission to his state university law school while others, some of them nonresidents and of mediocre academic standing, were admitted? Did the legislative or the executive branches of government ever delegate authority to handle admission of a state university law school in this fashion? Following is a brief description of the admission procedures as shown by this record.

The admissions practices which operated to deny Mr. DeFunis' application were developed by the law faculty under the claimed authority of the Board of Regents and the president of the university. An admissions and readmissions committee consisting of five members of the faculty and, for reasons not made clear in the record, two law students, had been established by the dean and a majority of the law faculty to decide who would be admitted. Although each of the two law student members possessed full

voting powers and served with exactly the same authority as each of the five faculty members, the record is devoid of any standards applied as basis for their appointment to the committee on admissions.

For example, Tama Zorn, one of the student members who testified, said that she had become a member during her first year in law school. Although actually a resident of Washington, D.C., she had been accorded what she described as resident status for tuition purposes on entering law school. She had not been selected for appointment to the committee on admissions or readmissions by the faculty, the regents or the president of the university, but, rather, had been delegated to it by an entity called the Student Bar Association. Her appointment to the committee on admissions and readmissions was based on little more than her application to that organization. In this fashion, the Student Bar Association appointed the two student members to the committee largely upon their request with little or no thought to their qualifications and less as to their purpose, and with no indication in this record that the Student Bar Association itself possessed any particular talents or qualifications to pass in turn upon the qualifications of its incoming fellow students.

Mrs. Zorn said that the admission committee members had no personal acquaintance with the applicants; that her knowledge of the applicants' aptitudes and qualifications had to be derived exclusively from their application files and the decisions reached from a "policy that intends to encourage minority students to come to law school and practice law in the community." Minority students could readily be identified from the files of the applicants but one could not tell whether they were economically underprivileged or, as the term is used, culturally deprived. She did acknowledge, however, that Asian Americans, although a minority, were given no preferential treatment.

In devising the modus operandi for carrying out the policy of preferential treatment, little thought was given to

the possibility that, in addition to being suspect constitutionally, the practice might well be ultra vires for it placed a controlling power over the careers and even the lives of many potential students in the hands of their fellow students.

The two law student members of the committee each exercised an initial and virtually controlling vote in the screening of about 60 or 70 applicants. Each member of the committee, including student members, was given approximately 70 files upon which to make recommendation for admission or rejection, with instructions that only about 10 were to be approved for admission and the remaining 60 rejected. Thus, of over 1,500 files to be examined, 490 files were distributed among the committee members. Each member would arrive at what was determined to be a cutoff point below which the files would be summarily rejected, and in the usual course of events those files received no further consideration.

Of the approximately 70 files given to each member, both student and faculty accordingly would return to the whole committee a recommendation of 10 for admission. Since the 70 files per committee member represented only 490 of some 1,500 plus, Mrs. Zorn testified she assumed that several hundred applicants had been summarily rejected before distribution of the 70 files to each member, and quite possibly some had been summarily admitted. In general, it is a fair summary of the record, I think, that of the approximately 70 files distributed to each committee member, an applicant neither included in the 10 recommended nor in some 20 more carried as secondary possibilities had little or no chance for admission.

Thus, some 40 student applicants were categorically rejected, another 20 given only secondary or uncertain chances, and 10 applicants put in a categorically positive position for admission upon nothing more than the recommendation of a first- or second-year law student. Mrs. Zorn testified that of the 40 files marked by her for rejection, she

had no subsequent knowledge or further contact. As far as she knew, they were consigned thenceforth to bureaucratic oblivion.

After reviewing Mr. DeFunis' file prior to trial, Mrs. Zorn said that it indicated nothing derogatory, but, as she expressed it, showed something perhaps negative. This vague or perhaps negative feeling she derived, as she testified, from the following comment contained in his file, appearing in one of the recommendations supplied on Mr. DeFunis' behalf:

> "This guy is a person I would refer to as the planner. He sets his goal and steadily works toward it, come Hell or high water. I admire him in his persistence, but there seems to be the slight tendency of not caring upon whom he might step in the process. I have known him for four years and as an adviser for three quarters, and as a student in one of my classes. His major is in political science but with strong—". Well, I can't read that next word, "in history and sociology. His hobbies are sports, classical music collection and classical guitar. He has helped finance his education by sales work, book store and Seattle Park Department laborer. His activities are campers—" THE COURT: Campus. MR. DIAMOND: "—on campus have been largely political oriented, mobile, model congress and mock political convention. He wishes to practice law. I recommend."

The negative qualities of these file comments are, indeed, hard to identify, but for some reason or other Mrs. Zorn thought them to be unfavorable and said that they contributed to warranting a rejection. She conceded, however, that Mr. DeFunis' LSAT score was higher than the scores of many she recommended for acceptance.

There is also a curious aura of civil, political or community "activism," as it is sometimes called, surrounding the recommendations for admission or rejection. One student applicant recommended by Mrs. Zorn had an LSAT of 562, substantially lower than the average of Mr. DeFunis, but was recommended for the waiting list because of being very active on campus and in his community. The activity which impressed her the most was that he was a founding

member of Isla Vista Branch of the American Civil Liberties Union and president of its student chapter at the University of California, Santa Barbara. He had participated in the John Tunney for Senate campaign in California and in the operation of a student owned and operated radio station in Santa Barbara. Also, the applicant had been a campus news reporter and a member of several other campus organizations. Mrs. Zorn had concluded that these activities, despite the low LSAT, established sound basis for admission to the law school. She recommended, however, against the admission of another student with a 3.9 junior-senior grade average because she did not think that his area of study, the field of finance, adequately significant. Finance, as she put it, was a program without rigor. She was apparently unaware of the rigorous nature of courses in accountancy, statistics, economics and banking as taught at the University of Washington.

Another student member of the admissions committee, Mr. Hayes, testified he had been put on the committee during his first year of law school but left it because of poor grades. As he explained his departure, "I just barely made it to the second year." Like Mrs. Zorn, Mr. Hayes was given a stack of files to review, but, because of his part-time work, he reviewed substantially fewer files than did the other members of the committee. He said he had had no special training with respect to judging or passing upon applicants to the university law school and had been put on the committee simply by adding his name to a sign-up sheet from which the Student Bar Association had then picked him. Testifying concerning one applicant whose junior-senior grade point average was only 2.89, a comparatively low grade, he acknowledged, that applicant's file cover contained the statement entered by a committee member, "We seem to have bungled this one pretty conclusively. He's got us." The committee, having mistakenly accepted that applicant, he said, did not rectify the error and the particular applicant remained admitted.

The committee, he said, was trying to achieve what he described as a class balance based on an estimated potential for getting through school. He said most of the files given him for review were those of minority students. Another applicant he recommended for admission had a junior-senior grade point average of only 2.63 with the notation, "Excellent recommendations, sound record. Divorced with five kids. Could make it if her personal situation could be worked out, lightened load possibility? Admit."

Another student member, Mrs. Rochelle Kleinberg, was put on the admissions committee during her second year of law school. She was appointed, she said, by the Student Bar Association as was Mrs. Zorn simply by putting her name on a posted sign-up sheet. When asked why she had sought the appointment, she said that she thought it had an important role in the law school and wished to participate. As it turned out, the role was in fact extremely important for the future of many highly qualified student applicants.

Mrs. Kleinberg, as did most of the others, initially received about 70 files for review and eliminated 50 or 60 of them below what she deemed an appropriate cutoff point. Thus, the rejected applicants had no way of knowing that their opportunities for admission had been summarily curtailed by the simple act of rejection done by a law student engaged in the initial review of some 70 files.

A random examination of the records of various students accepted by the law school in the entering classes for which Mr. DeFunis had applied shows extraordinary and inexplicable variations in their qualifications. One admitted applicant showed an almost vertical academic climb. He had a junior-senior grade point average of 3.64, but an overall grade point average of 2.85. The admission committee notes in his file read as follows: "Overall GPA 2.85. strange recommend. 'arrogant, conceited' but apparently bright . . . [not readable] Take a chance on his screwy personality & admit." His PFYA was 78.35 with a writing score of 71. One cannot discern from the files whether a height-

ened community or campus activity, or whatever, constituted the determining factor for admission. One young woman with a junior-senior GPA of 3, an LSAT of 702, and a writing score of 66, was admitted by a letter from the dean dated September 14, 1971, with no comment, remark or recommendation whatever from the admissions council.

An applicant with a junior-senior GPA of 2.37 and an LSAT score of 475, was admitted by letter from the associate dean dated July 29, 1971, despite the remarks of the admissions committee that he be rejected. Another applicant with a junior-senior GPA of 3.32, an LSAT of 759, and a writing score of 60 was admitted by letter of July 23, 1971, from the associate dean of the law school despite the admissions committee's remarks set forth in his file that his "recommendations are equivocal and his academic career unimpressive." The admissions council deemed unimpressive a 3.32 junior-senior average earned in chemistry, physics, analytical geometry, calculus and general physics laboratory. This particular applicant with the so-called unimpressive academic record had also earned 6 hours of A in advanced calculus, 6 hours of A in mechanics and an A in introduction to digital computers.

Another young woman, earlier alluded to, was admitted to the law school with a junior-senior grade point average of 2.63, an LSAT of 481, and a writing score of 55. The file shows that she was 35 years of age at the time of admission and would thus be 38 upon graduation, if indeed able to complete the program on schedule. The remarks entered by the admissions council in her file note that she was "Divorced with five kids. Could make it if her personal situation could be worked out." It added, "Excellent recommendations; sound record," and upon these conclusions recommended admission to the law school.

By letter of March 2, 1971, an applicant with a junior-senior grade point average of 2.89, an LSAT of 663 and a writing score of 58 was accepted. Other than pointing out that the applicant was a member of a minority, the admissions council was noncommittal.

Another applicant admitted with a junior-senior grade point average of 3.56 had an LSAT of 625. Despite these high qualifications, the determining factor for admission here as revealed in the file is the remark on the admissions council list: "Enthusiastic recommendation. Abundant community action projects."

Another applicant earned a remarkably high junior-senior GPA of 3.90 and scored 599 in the LSAT, but achieved a writing score of only 46. He was notified of his acceptance by letter September 14, 1971, by the dean of the law school. There is apparently very slight correlation in many cases among the GPA, the LSAT, and the writing scores.

An applicant with a GPA of 3.55 was notified of his acceptance by the law school by letter of May 21, 1971, from the associate dean after achieving an LSAT of 625 and a writing score of 61. For some reason or other, the admissions committee recommended against outright admission but that he be placed on the waiting list. Despite this, however, the applicant was categorically admitted.

Of the approximately 150 students actually enrolled in the class for which petitioner DeFunis made his application, only some 42 admission files were placed in evidence. But an inspection of these files, in my judgment, fails to show any consistent policy on admissions at which a prelaw student could aim his career. If he is intelligent, works hard, and achieves high grades, his place in the law school class may be preempted by someone with lesser grades but who is engaged in what is described as "community activities," or is otherwise described as a student activist. Or, if he is engaged in community activities and still attains high grades through diligence and intelligence and long hours at the books, his position may be taken in the entering class by one who has neither engaged in "community activity" nor achieved high grades but, nevertheless, has made a high LSAT score. Or, even if he studied hard, is intelligent, and placed high in grades, LSAT and PFYA, and engaged in what are called community activities, his place might

still be awarded to a minority student who has done none of these. All of these inequities are, I fear, bound to foster a spirit of anti-intellectualism in the heart of what should be an intellectual center.

The discriminatory character of the admissions policy is, I think, well epitomized by the trial court in its oral decision:

> The applications of the black students were separated from all others and assigned for review to a black student and a professor who had worked closely with the CLEO Program.
>
> Some minority students were admitted whose college grades and aptitude test scores were so low that had they been whites their applications would have been summarily denied. Excluding the Asians, only one minority student out of 31 admitted among the applicants had a predicted first year average above the plaintiff's.
>
> Since no more than 150 applicants were to be admitted the admission of less qualified resulted in a denial of places to those otherwise qualified.

This method of selection operated to deprive Mr. De-Funis of his position in the entering law classes both in 1970 and again in 1971. Not being a member of a preferred ethnic minority, he found his place taken by others who not only possessed far lower credentials and qualifications but among whom were some who on the face of their records were unqualified. He was the victim of what in current parlance has come to be described as "affirmative action," which includes preferential treatment for the sake of creating a more equitable racial balance—a process which the court now finds constitutional.

If this be constitutional, then, of course, the constitutions are not color blind; one racial group may be given political or economic preferment over another solely because of race or ethnic origin. Yet, this was the very thing that the Fourteenth Amendment was designed to prevent. All races, and all individuals, are entitled to equal opportunity to enter the law school. To admit some solely because of race or ethnic origin is to deny others that privilege solely for

the same reasons, which in law amounts to a denial of equal protection to the one while granting special privileges and immunities to the other.

The United States District Court, Northern District of California, recently stated what I perceive to be the controlling principle here when it said in its findings of fact in *Anderson v. San Francisco Unified School Dist.*, 357 F. Supp. 248 (N.D. Cal. 1972):

> No one race or ethnic group should ever be accorded preferential treatment over another. No race or ethnic group should ever be granted privileges or prerogatives not given to every other race. There is no place for race or ethnic groupings in America. Only in individual accomplishment can equality be achieved.

With the possible exception of administering justice, I accept the dicta in *Brown v. Board of Educ.*, 347 U.S. 483, 98 L. Ed. 873, 74 S. Ct. 686, 38 A.L.R.2d 1180 (1954), that education is probably the most important function of state and local government. It should not be forgotten, however, that in striking down decisively the separate but equal concept of segregated schools, the rationale of that decision rested on equality of opportunity and the premise that segregation based on race or color amounted categorically to an unconstitutional denial of that equality. In speaking of equality of educational opportunity, the court there said, "Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." 347 U.S. at 493.

The mainstream of current constitutional law runs forthrightly against the discriminatory practice of preferential treatment based on race, color, or ethnic origin. In *McLaughlin v. Florida*, 379 U.S. 184, 13 L. Ed. 2d 222, 85 S. Ct. 283 (1964), an adultery statute imposing greater penalties when the participants were of different races was held unconstitutional under the Fourteenth Amendment. Despite the wide legislative judgment to be sustained in determining whether an act is reasonably designed to attack the evil aimed at, any classification based upon race must,

it was held, be suspect at the outset on the general rule that the constitution and amendments were intended to eliminate all racial discrimination arising from official actions. *Bolling v. Sharpe,* 347 U.S. 497, 98 L. Ed. 884, 74 S. Ct. 693 (1954).

As pointed out in *McLaughlin v. Florida, supra,* racial classification has been held invalid in many cases: race was required to be designated in voting and property records (*Virginia State Bd. of Elections v. Hamm,* 379 U.S. 19, 13 L. Ed. 2d 91, 85 S. Ct. 157 (1964)); designation of race on nomination papers and ballots (*Anderson v. Martin,* 375 U.S. 399, 11 L. Ed. 2d 430, 84 S. Ct. 454 (1964)); racial segregation in public parks and playgrounds (*Watson v. Memphis,* 373 U.S. 526, 10 L. Ed. 2d 529, 83 S. Ct. 1314 (1963)); segregation in the public schools (*Brown v. Board of Educ.,* 349 U.S. 294, 99 L. Ed. 1083, 75 S. Ct. 753 and 347 U.S. 483, 98 L. Ed. 873, 74 S. Ct. 686, 38 A.L.R.2d 1180 (1954)); segregation of the races in public transportation (*Gayle v. Browder,* 352 U.S. 903, 1 L. Ed. 2d 114, 77 S. Ct. 145 (1956)); and as a social practice even without sanction of ordinance or statute in public restaurants (*Lombard v. Louisiana,* 373 U.S. 267, 10 L. Ed. 2d 338, 83 S. Ct. 1122 (1963)); and in public swimming areas. *Baltimore v. Dawson,* 350 U.S. 877, 100 L. Ed. 774, 76 S. Ct. 133 (1955). All were held repugnant to the constitution. If the Fourteenth Amendment stands for anything at all, it should be clear from these decisions that it stands for the principle that all discrimination based on race, religion, creed, color or ethnic background by any state, its constitutions, its subdivisions, or its agencies, is prohibited.

The majority concedes and the record is indisputable that petitioner DeFunis was ousted from the list of acceptable students solely because of preference accorded others, and that this preference was granted to many solely because of race and ethnic origin. Even though there are many areas of public endeavor where it would be deemed a valid and constitutional exercise of the police power to provide spe-

cial assistance for those segments of our population described as disadvantaged or poor, or culturally deprived, such special assistance could not constitutionally deprive Mr. DeFunis of a seat in the law school and award it to a member of a group whose existence is defined or controlled by considerations of race or ethnic origin. When the seat in the law school is awarded on the basis of race or ethnic origin, the procedure necessarily falls within the constitutional principles prohibiting racial segregation or preference.

In referring to special aid and assistance, the fact remains that the committee on admissions and readmissions made no investigation whatever as to whether any of the minority students admitted were poorer, more disadvantaged or more culturally deprived than some of the students of higher educational and aptitude qualifications who had been turned down. The committee simply applied a theory and ipso facto assumed that every Black American, Indian American or Chicano, or Philippine American, because of his ethnic origin of necessity had to be more disadvantaged, poorer and more culturally deprived than those of Asian, Caucasian, or other ethnic origin.

The case of *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 20 L. Ed. 2d 1189, 88 S. Ct. 2186 (1968), sustaining an act of Congress which prohibited racial discrimination against Blacks in occupying or purchasing federally aided housing, in my view, supports rather than disparages DeFunis' position and does not, I think, purport to find the constitution color conscious. There the court held that the Congress had constitutional power to prevent the expenditure of public funds for the enhancement of one racial group to the detriment of other racial groups. It held that, where state law affords preference on the basis of race so that it works a detriment to others on the basis of race, the law and regulation pursuant to it are inevitably repugnant to the Fourteenth Amendment.

This means that this court's decision in *State ex rel. Citizens Against Mandatory Bussing v. Brooks*, 80 Wn.2d

121, 492 P.2d 536 (1972), would tend to sustain DeFunis' position in the present case. There is no more than a coincidental parallel between the *Mandatory Bussing* case and Mr. DeFunis' case. There we sustained a modest program of compulsory bussing initiated by the Seattle school district for the stated purpose of assuring higher quality of education for all students of whatever racial, religious or ethnic background. The policy of required bussing has been adopted because the school board was of the opinion that racially segregated schools, even those where the segregation is de facto and not de jure, are inferior to integrated schools, and that a racially segregated student body will receive an education inferior to that of a racially integrated student body. This court held that the school board was acting within its lawful powers in reaching this conclusion and in implementing its views by a program of mandatory bussing. In the *Mandatory Bussing* case, the Seattle school board did no more than act officially upon conclusions it had the authority to reach, and provide for racially integrated education while curtailing de facto segregation.

There is no genuine parallel between Mr. DeFunis' case and the case of the children required to ride the busses. There, we were dealing with a procedurally sound administrative determination that every child, under the plan and the constitution, would gain an integrated and thereby superior education at the expense of no other child. Providing one child with a better, *i.e.*, integrated, education did not operate to deprive another of an equal, integrated education. Benefit to one would not be at the expense of another. Putting one child on a bus to ride to school did not operate to take away another's seat in the classroom. Ordering bussing to eliminate segregated schools was no less compatible with the constitutions than the idea that children needing or requesting specialized training may have to ride busses to special schools because every department and facility of a school system, in the nature of things, cannot be equidistant from all children. In the *Mandatory Bussing* case, the Seattle school board was attempting to discharge

its constitutional duty of providing equality of educational opportunity for all children within the district at the expense of no child or children.

Here we have precisely the opposite. Putting some applicants into the classroom deprived a qualified applicant of his seat there. It operated to deprive him thereby of the equal protection of the laws and at the same time granted to others privileges and immunities not available to him on equal terms. Thus, aside from the patently arbitrary and capricious method earlier delineated, by which Mr. De-Funis' position was given to a less qualified applicant, his ouster fell explicitly within the constitutional principle that education must be provided to all students on equal terms and all public education programs must be conducted without regard to race, color or national origin. *Kemp v. Beasley,* 352 F.2d 14 (8th Cir. 1965).

Are there methods by which a state owned and operated law school may be fairly and constitutionally administered so as to comport with the constitutions? Although the courts have neither the power nor the aptitude to operate a university and should be without the inclination to do so, several possible methods come to mind which prima facie, at least, meet the fairness and equal protection standards of the constitutions. One would be a system of comprehensive competitive examinations in predesignated courses such as English, history, basic science, mathematics, economics and sociology, and with optional courses in other fields selected by the student.

Another method would be to work out a reasonably accurate mathematical correlation between grade values from different colleges or universities in preannounced prelaw courses and to compute those equivalent grades with admission granted the 150 students with the highest grades. This gives every student a fair chance to achieve his ambition.

Another possible solution—in case the faculty believes that high prelaw grades should not be the main criterion—prescribe a sound but not extraordinarily high prelaw

grade standard and make a random selection by lot and chance of the 275 applicants to be admitted from among those qualifying. And the fairest way of all—but I doubt its efficacy—admit all applicants possessing a minimum prerequisite grade point in prescribed courses, conduct the law classes in the field house or stadium, if necessary, give frequent examinations, and let the better qualified few survive on the basis of their grades in law school. There are, of course, other methods equally fair and impartial which may be readily developed, all of which will meet the constitutional tests of fair and impartial application. But whatever scheme is developed, one thing is certain: Keep it within the principles of the constitutions, no one can be preferred and no one can be disparaged because of race, color, creed, ethnic origin or domestic environment.

If it is the state policy—and I think it should be—to afford special training, guidance and coaching to those students whose domestic environment has deprived them of a fair chance to compete, or to provide financial assistance to students in economic straits, it is within the state's constitutional powers to do so, but once these students have reached the point of seeking admission to a professional or graduate school, no preference or partiality can or should, under the constitutions, be shown them.

The rationale of *Anderson v. San Francisco Unified School Dist.*, 357 F. Supp. 248 (N.D. Cal. 1972), an opinion dated October 30, 1972, filed in the United States District Court, Northern District of California, I think, expresses the principles which should govern the *DeFunis* case. That court held unconstitutional a school district's plan to give preference in employment and promotions to members of ethnic minorities in administrative and supervisory positions, such as principals, assistant principals, deans and heads of departments—a plan designed to increase the numerical representation of ethnic minorities in the administration of the schools. That court, in holding the scheme unconstitutional, said that "The key issue in this case is whether or not a classification which is based on

race is valid," and answered it with a statement of princi-ples which ought to control here:

Preferential treatment under the guise of "affirmative action" is the imposition of one form of racial discrimina-tion in place of another. The questions that must be asked in this regard are: must an individual sacrifice his right to be judged on his own merit by accepting discrim-ination based solely on the color of his skin? How can we achieve the goal of equal opportunity for all if, in the process, we deny equal opportunity to some?

Mr. DeFunis came before the bar of the Superior Court much as did petitioners, parents of schoolchildren, in *Brown v. Board of Educ.*, 347 U.S. 483, 98 L. Ed. 873, 74 S. Ct. 686 (1954), asking that he not be denied admission to the university law school because of race or ethnic origin. The trial court properly ordered his admission. So, too, would I, and, therefore, I would affirm.

HUNTER, J., concurs with HALE, C.J.

HUNTER, J. (dissenting)—The majority supports a lauda-ble purpose—to enable students of certain minority races to enter the University of Washington School of Law in order that ultimately there will be a greater representation of practicing lawyers of those races in the legal profession—with which purpose I do not disagree. This must not be accomplished, however, by clear and willful discrimination against students of other races as the Admissions Commit-tee of the University of Washington School of Law has done in this case by denying admission to the respondent, Marco DeFunis, Jr., to this school, as found by the trial court and amply supported by the record.

This action by the admissions committee of the school of law constitutes arbitrary and capricious action, flaunting the guarantees of the equal protection provisions to all citizens as provided in our state and federal constitutions.

The line of federal cases cited by the majority are not in point. They stand for the proposition that full opportunity for education be afforded to students of all races; whereas,

the present case denies the opportunity of education to students of one race to make room for students of other races and with lesser qualifications.

I would affirm the trial court, directing the admissions committee to admit the respondent, Marco DeFunis, Jr., to the University of Washington School of Law.

HALE, C.J., concurs with HUNTER, J.

Petition for rehearing denied May 16, 1973.