431 F.2d 1254
 2 Fair Empl.Prac.Cas. 1024, 2 Empl. Prac.
Dec. P 10,310
 Victor PORCELLI, Appellant in 18286, Francis Bigley, Arthur
Shapiro, Allan M. Cohn, Helen R. Justin, Maxine F.
Edelstein, Robert J. Hickey, William J. Dunne, Jr., William
C. La Russo and Joseph Chagnon
v.
Franklyn TITUS, Superintendent of Schools of the City of
Newark, and the Boardof Education of Newark, in
the City of Essex Bertram Coppock,
Theresa David andCharles
Haynes, Intervenors
(in D.C.).
Appeal of Arthur SHAPIRO, in 18287.
Appeal of Allan M. COHN, in 18288.
Appeal of Maxine F. EDELSTEIN, in 18289.
Appeal of Helen R. JUSTIN, in 18290.
 Nos. 18286-18290.
 
 United States Court of Appeals, Third Circuit.
 Argued April 24, 1970.
Decided Sept. 23, 1970.
 Joseph F. Walsh, Bracken & Walsh, Newark, N.J., for appellants.
 Victor A. DeFilippo, Newark, N.J., for Franklyn Titus and Bd. of Ed. of Newark.
 Frank Askin, Newark, N.J., for Charles Haynes (Steve Nagler, New Jersey Civil Liberties Union Newark, N.J., on the brief).
 Before GANEY, VAN DUSEN and GIBBONS, Circuit Judges.
 OPINION OF THE COURT
 PER CURIAM:
 
 
 1
 The plaintiffs herein, Victor Porcelli et al., ten white teachers employed by the Newark Board of Education, brought suit under the Civil Rights Act[1] alleging that as of May 28, 1968, the defendant, Superintendent of Schools in the City of Newark Franklyn Titus, acting under color of law for the Newark School System, subjected the plaintiffs to deprivation of their rights, privileges or immunities secured to them by the Constitution of the United States of America. This allegedly was accomplished by the abolition of a promotional list which had been in existence since 1953, which provided for oral and written examinations for anyone wishing to aspire to be principals or vice-principals in the System and which, it was contended by so doing, racially discriminated against whites whose names appeared on the promotional list for appointment. At the time of the abolition or suspension of the said promotional list, the first fifteen thereon had been appointed, but Porcelli, Bigley and Shapiro, plaintiffs herein, though eligible, had not yet been appointed.
 
 
 2
 The school population in the City of Newark in October, 1961, was 67,134, of which the Negro population was 55.1%. In September, 1968, the total school population was 75,876, with a Negro student population of 72.5% Reflecting an increase in seven years of 8,742 students and a percentage increase of Negro students of 17.4%. During the school year 1967-1968, there were 249 administrative and supervisory positions (superintendents, principals and vice-principals, senior and junior high school principals, etc.), of which 27, or 10%, were held by Negroes. On August 22, 1968, only one Negro each for principal and vice-principal was eligible on the promotional list and of the 72 principals in the system none were Negro and of 67 vice-principals, 64 were white and 3 Negro.
 
 
 3
 On February 1, 1967, School Board of the City of Newark entered into a contract with the Teachers Association.[2]
 
 
 4
 Under date of May 28, 1968, defendant Board of Education passed a resolution suspending and abolishing the making of appointments from this list and instead the defendant, Franklyn Titus, Superintendent of the School System in Newark, presented certain recommendations for the appointments of principals, vice-principals, senior and junior high school principals, which the Board adopted, representing a total of 35 white appointments and 20 Negro appointments.[3] The appointments were designated as temporary appointments and the Board was to later review the appointments recommended, the criteria to be used by the Board having not as yet been finalized. In his recommendation to the Board the Superintendent candidly admitted that color was one of the criteria which he utilized, contending that the pattern by which principals, vice-principals and others were appointed reflected an era in 1953, when the promotional list was adopted, and as of 1968, conditions had so changed in the Newark School System that the promotional list had become outmoded by virtue of the changing population, community-wise and in the school system, which had occurred since its adoption.
 
 
 5
 This action was begun by a motion for summary judgment on the pleading, but the lower court denied it and ordered a full evidentiary hearing at which both sides were heard at great length. Superintendent Titus, one of the defendants, stated as one of his reasons for the abolition of the promotional list the fact that the Newark Public School System, especially in reading, was well below the national norm which obtained throughout the country; that there was such a great imbalance in the principal and vice-principal positions that, in his professional judgment, he felt that by adding a Negro who was qualified to these important positions, thus making the faculty more integrated, would the more readily lend itself to an upgrading of the Public School System in Newark. Although, as has been indicated, color was frankly admitted by all the witnesses for the appellees as being one of the factors in the selection of the principals and vice-principals, and one Simeon Moss, who was the assistant superintendent for elementary education who made the recommendations to the Superintendent for the appointments, stated that color was a prime factor, it was not the only factor, as the procuring of qualified individuals was the real objective.[4] Plaintiffs' position was that this use of color in the selection of principals and vice-principals and the device used to achieve that selection by abolition or suspension of the promotional list was a violation of their Constitutional rights under the Fourteenth Amendment.
 
 
 6
 With this contention we do not agree. State action based partly on considerations of color, when color is not used per se, and in furtherance of a proper governmental objective, is not necessarily a violation of the Fourteenth Amendment. Proper integration of faculties is as important as proper integration of schools themselves, as set forth in Brown v. Board of Education, 349 U.S. 294, 295, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the thrust of which extends to the selection of faculties. In Kemp v. Beasley, 389 F.2d 178, at 189 (8 Cir. 1968), the court held, where race was a consideration in the selection of teachers and faculties, 'We reaffirm the principle that faculty selection must remain for the board and sensitive expertise of the School Board and its officials.' And, at page 190, 'The question thus becomes, when is there such faculty distribution as to provide equal opportunities to all students and to all teachers-- whether white or Negro? Students in each school should have the same quality of instruction as in any other school. Every predominantly Negro school should have, wherever possible, substantially as integrated a faculty as the predominantly white school.'
 
 
 7
 Again, in Springfield School Committee v. Barksdale, 348 F.2d 261, 266 (5 Cir.1965), the court stated, 'It has been suggested that classification by race is unlawful regardless of the worthiness of the objective. We do not agree. The defendants' proposed action does not concern race insofar as race correlates with proven deprivation of educational opportunity.' Further, in United States v. Jefferson County Board of Education, 372 F.2d 836, 895 (5 Cir.1966), it was stated, 'As to faculty, we have found that school authorities have an affirmative duty to break up the historical pattern of segregated faculties, the hall-mark of the dual system.'
 
 
 8
 It would therefore seem that the Boards of Education have a very definite affirmative duty to integrate school faculties and to permit a great imbalance in faculties-- as obtained on August 22, 1968, when a new plan was proposed to the School Board in Newark for the increasing of qualified Negro administrators-- would be in negation of the Fourteenth Amendment to the Constitution and the line of cases which have followed Brown v. Board of Education, supra.
 
 
 9
 We concur in the carefully considered opinion of Chief Judge Augelli, dated August 14, 1969, wherein he made findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) (Porcelli v. Titus, 302 F.Supp. 726 (District of New Jersey 1969)). He also 0(District of New Jersey 1969)). He also entered a final order dismissing the complaint with prejudice on September 17, 1969.
 
 
 10
 The judgment of the lower court will be affirmed.
 
 
 
 [1]
 The Civil Rights Act of 1964, 42 U.S.C. 1983 (1964), Civil action for deprivation of rights--
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.
 
 
 [2]
 Under the terms of the contract, it was required:
 'A. The positions of principal, vice principal, head teacher, department chairman and counsellor shall be filled in order of numerical ranking from the appropriate list, which ranking shall be determined by written and oral examination. Appointments to the position of teacher to assist principal (formerly called Administrative Assistant) shall be made annually on a temporary basis if the Superintendent determines that such a position is necessary or desirable, and all appointments to such position shall be made in order of numerical ranking from the appropriate vice-principal's list if such a list exists.
 'B. Such examinations shall be given at regularly scheduled intervals and shall be adequately publicized in every school at least sixty (60) days in advance.
 'C. All openings for the positions of supervisor, assistant supervisor and director and all positions hereafter created in new categories not existing shall be adequately publicized in every school at least sixty (60) days before the appointment is made and the qualifications for the positions shall be clearly set forth.'
 
 
 [3]
 A breakdown of these recommendations is as follows:
 -----------------------------------------------------
 Level Acting Position White Negro
-----------------------------------------------------
Elementary Principal 1 4
 Vice Principal 0 2
 Teacher to assist Principal 3 1
Secondary Principal, Senior High 2 0
 Principal, Junior High 1 0
 Vice Principal, Senior High 8 4
 Vice Principal, Junior High 3 0
 Teacher to assist Principal 3 8
 Department Chairman 11 0
 Supervisory Assistant,
 Junior High 3 1
 ----- -----
Total 35 20
 
 
 [4]
 The findings of fact in the district court opinion, 302 F.Supp. at 732-733, include the following:
 'A fair evaluation of the record supports the conclusion that the promotional lists were suspended and the examination system abolished, not simply to appoint Negroes to promotional positions, but to obtain for these positions qualified persons, white or black, whose qualifications were based on an awareness of, and sensitivity to, the problems of educating the Newark school population. * * *
 'The Court is satisfied that in abolishing the examination procedure, there was no intention on the part of the Board to discriminate against white persons or exclude them from consideration for promotional positions. No inference of any such intention can be gleaned from the record. The testimony of several of the witnesses * * * shows that, despite a desire to provide an avenue for the appointment of more Negro administrators, the ultimate objective of the Board was to promote those persons most qualified to suit the needs of the Newark school system. There is nothing in the record to indicate that the Board was attempting to appoint Negroes in numbers proportionate to the school population.'