Robert Paul OBURN et al.

v.

Milton SHAPP et al.

Donald LUTZ and Michael Warfel, Plaintiffs,

v.

Milton SHAPP et al.

Civ. A. Nos. 75-619, 75-631.

United States District Court, E. D. Pennsylvania.

March 5, 1975.

Allen E. Ertel, William S. Kieser, Williamsport, Pa., for plaintiffs.

Norman J. Watkins, Lawrence F. Clark, Jr., Harrisburg, Pa., Harold I. Goodman, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

CLIFFORD SCOTT GREEN, District Judge.

Plaintiffs in both of the above captioned actions have moved for a preliminary injunction enjoining defendants "from appointing, seating or training any applicants to the State Police Academy or otherwise hiring any personnel for the State Police as police officers and from promoting any persons within said organization", pending the final hearing and determination of the actions. In C.A. 75–619, hereinafter referred to as the Oburn case, Mr. Oburn and five other individuals filed a complaint alleging that it was filed individually and on behalf of all other persons similarly situated alleging that the procedure followed by defendants in selecting a class of cadets for training to be members of the State Police violated certain rights of plaintiffs, most particularly plaintiffs' rights to equal protection guaranteed by the Fourteenth

Amendment to the United States Constitution and alleged rights of plaintiffs under the Civil Rights Law of the United States, 42 U.S.C.A. § 1983. All of the individual plaintiffs alleged that their scores on a written examination were higher than the scores achieved by certain minorities and Spanish-surnamed individuals who have been selected for the class and plaintiffs contend that by virtue of the higher scores plaintiffs should have been selected for further processing which is a necessary step to admission to the class. The Oburn case also has as named plaintiffs the Conference of State Police Lodges of the Fraternal Order of Police which is described as an unincorporated association representing all Pennsylvania State Police throughout the state. The Conference is described as the official bargaining agent in labor negotiations for the Pennsylvania State Police and the complaint alleges that the Conference brings this action on behalf of all members of the State Police and all others who may become similarly situated. The Conference seeks to enjoin the admission of the class of cadets scheduled to start training on March 6, 1975 and also to enjoin the promotion procedures of the State Police as they are now being administered. Promotion examinations are not presently scheduled and the parties have agreed that a determination of plaintiffs' request for injunctive relief in regard to promotion procedures be deferred and that the only matter presently before the Court for determination is plaintiffs' motion to enjoin the admission of the class of cadets scheduled for March 6.

The defendants named in the suit are Governor Milton Shapp, the Commissioner of the Pennsylvania State Police, James D. Barger, then Attorney General, Israel Packel, the Director of the Office of Administration, Richard Madison, the Lieutenant Governor, Ernest P. Kline, and the Director of the State Civil Service, Richard Rosenberry. All of said defendants are sued both individually and in their official capacities.

In C.A. 75–631, hereinafter referred to as the Lutz case, there are two plaintiffs who claim to bring the action on their own behalf and of all others similarly situated pursuant to Rule 23(a) and (b) of F.R.Civ.P. Plaintiffs Lutz and Warfel allege that after final processing they placed number 139 and number 122 respectively on the list of those eligible for appointment as cadets, and that in fact they were not accepted, notwithstanding the fact that 153 persons were accepted for entrance into the cadet class. They allege that 40 of the persons accepted were not among the persons receiving the 153 highest scores and that they were passed over in favor of persons classified as minority or Spanish-surnamed. In the Lutz complaint, the same persons are named as defendants as are set forth in the Oburn complaint with the exception that the present Attorney General, Robert T. Kane, is named as a party defendant instead of the former Attorney General, Israel Packel.

The history of the Oburn case reveals that the action was first filed in the United States District Court for the Middle District of Pennsylvania and that, pursuant to plaintiffs' motion, Judge Herman to whom the case was assigned requested the convening of a three-judge court. On February 18, 1975 a three-judge court was convened, consisting of the Hon. Joseph F. Weis, Jr., United States Circuit Judge, and the Hon. Michael H. Sheridan, Chief Judge, and the Hon. R. Dixon Herman of the United States District Court of the Middle District of Pennsylvania. The order further provided: "The Court so convened is free to determine whether the subject matter of the action creates a proper case for a Three-Judge Court." After hearing on February 27, 1975, the Three-Judge Court deferred ruling on any of the motions pending before the Court except the motion filed on behalf

of defendants to transfer the case to the Eastern District of Pennsylvania, and after entering the transfer order the statutory Three-Judge Court was dissolved. The Oburn case was filed on January 3, 1975,. and the ruling of the Three-Judge Court concerned only the Oburn case.

The Lutz case was filed in the United States District Court for the Middle District of Pennsylvania on February 24, 1975. On February 27, Judge Herman, in an action independent of the Three-Judge Court, denied the preliminary injunction requested by plaintiffs Lutz and Warfel; however, on the 28th day of February, 1975, Judge Herman vacated his order of February 27, denying the preliminary injunction, and transferred the Lutz case to the United States District Court for the Eastern District of Pennsylvania, "because the above case is a companion to Bolden v. Pennsylvania State Police, C.A. No. 73–2604 (E.D.Pa.)."

On Monday, March 3, 1975, I received a request from counsel for plaintiffs to set a time for hearing on their request for a preliminary injunction and the Court advised counsel for plaintiffs that said hearing would be scheduled for later in the afternoon of March 3. Counsel for plaintiffs requested additional time for preparation and the hearing was then scheduled for 9:30 A.M. on Tuesday, March 4. The hearing scheduled for March 4, was held as scheduled and was finally concluded at 10:30 P.M. on March 4, after both plaintiffs and defendants had full opportunity to offer all of the evidence which they desired and to make full legal argument to the Court. Now, March 5, 1975, we enter an order determining the issues presented to the Court and, by said order, deny plaintiffs' request for a preliminary injunction to enjoin the defendants from admitting a class to the State Police Academy as scheduled on March 6, 1975.

I

To understand the issues involved in Oburn and Lutz, we must judicially notice and discuss the Consent Decree entered in the matter of Bolden, et al. v. Penna. State Police, et al. filed in the United States District Court under C.A. No. 73–2604. Bolden filed an action, on his own behalf and behalf of all others similarly situated, seeking injunctive and declaratory relief against the Pennsylvania State Police; Col. James D. Barger, the Commissioner of the Pennsylvania State Police; Governor Milton J. Shapp; Lieutenant Governor Ernest P. Kline; Richard Madison and Richard Rosenberry; all of whom are also defendants in the Oburn and Lutz civil actions. In addition, Bolden named as defendants Ronald G. Lynch, the Secretary of the Office of Administration; Grace Hatch, John McCarthy and C. Herschel Jones, Commissioners of the State Civil Service. All of the defendants named in the Bolden civil action were sued both in their official capacity and individually. The jurisdiction of this Court was invoked pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4), plaintiff alleging that the action arose under the Thirteenth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1981, 1983, 1985(3) and 1988. The thrust of the complaint charged that the Pennsylvania State Police discriminated against minorities and Spanish-surnamed in its hiring and promotional practices and said discrimination was alleged to be based on race.

On February 12, 1974, plaintiffs in the Bolden action moved for a preliminary injunction. Thereafter, on February 26, 1974, plaintiffs sought an order pursuant to Rule 23(b)(2) of the F.R. Civ.P. that the action proceed as a class action on behalf of the following subclasses:

(a) All minorities who have unsuccessfully sought or will in the future

seek, employment with the Pennsylvania State Police;

(b) All minorities currently employed by the Pennsylvania State Police;

(c) All minorities who have been employed by the Pennsylvania State Police and who were subsequently discharged therefrom.

On March 8, after a hearing, an order was entered reinstating plaintiff Bolden as a member of the Pennsylvania State Police and the action thereafter continued in regard to the class action relief. On March 19, 1974, Howard Richard, Esq., entered his appearance for one Leo Pierce who moved to intervene as a defendant in the action. Said motion stated in pertinent part:

"Leo Pierce, individually, and as Chairman of the Conference of State Police Lodges, Fraternal Order of Police, and as a member of the Class of all Pennsylvania State Policemen similarly situated, moves for leave to intervene as a defendant in this action upon the following grounds:

(1) The Conference of State Police Lodges represents approximately 95% of all Pennsylvania State Policemen;

(2) The applicant individually and in his said representative capacity, has an interest relating to the matter which is the subject of this action and is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest. The said interest comprises the interest of the applicant individually, and in his representative capacity, to obtain promotions and other benefits within the Pennsylvania State Police force on the same equal basis that must be accorded to all citizens of the Commonwealth of Pennsylvania and the United States of America; . . ."

The Court took under advisement the motion to intervene. Prior to a determination of the motion, Benjamin Lerner, Deputy Attorney General, advised the Court that the then Attorney General Is-rael Packel, desired that the interest of the Conference of State Police Lodges, Fraternal Order of Police, be represented and accordingly Attorney General Packel had appointed Mr. Richard as an Assistant Attorney General to assist Mr. Lerner in the defense of the action. Immediately thereafter the Court authorized Mr. Richard to participate in the proceedings and the first action of Mr. Richard in this regard was to move the Court to recess the hearings in order that the parties could explore an amicable resolution of the controversy. Thereafter, the parties entered into negotiations, with Mr. Richard fully participating, and Mr. Pierce being present at many, if not all, of the negotiating conferences. During these negotiations, Mr. Richard and Mr. Pierce constantly advised the Court the negotiations were being discussed with State Troopers and members of the Fraternal Order of Police and that neither Mr. Richard nor Mr. Pierce could agree to any term of a consent decree until it had been fully discussed with the Fraternal Order of Police and the members of the Pennsylvania State Police. Because of this arrangement, the negotiations lasted for a period of many weeks until finally a proposed consent decree was submitted to the Court. This submitted consent decree was represented to be in final form, acceptable to all of the parties, and to be signed by plaintiffs' counsel, Harold I. Goodman and Robert J. Reinstein, and, also by both Benjamin Lerner and Howard Richard. The Court ordered that the decree be signed in open court and set a date for said proceeding. On the date set, Mr. Lerner, on behalf of all of the government defendants, was willing to sign the consent decree, but Mr. Richard declined to sign the decree at that time stating that he had to consult further with his clients. The Court thereupon ordered that the evidentiary hearings be resumed on June 20, 1974. However, on June 20, 1974, Mr. Lerner and Mr. Richard appeared in Court and advised the Court that they had approv-

al to sign the consent decree and they accordingly executed it. This executed document signed on the 20th of June, 1974 is the matter in question, the Bolden consent decree.

The above recital of facts concerning the formulation of the consent decree has been set out at length because one of the plaintiffs in the Oburn action is the Conference of State Police Lodges of the Fraternal Order of Police. The Conference also seeks to represent all members of the State Police and all others who may become similarly situated.

## II

In order to evaluate the claims, of the Oburn and Lutz plaintiffs, that the present procedures for selecting State Troopers subject plaintiffs to "reverse discrimination", we must consider the proceedings in Bolden and the consent decree entered therein, since this consent decree mandates the procedures which are attacked.

It is essential to know the evidentiary basis for the consent decree in order to determine whether plaintiffs have met their burden of showing a reasonable probability of eventual success in their lawsuits. Prior to the motion to intervene filed by Mr. Richard, on behalf of Mr. Pierce, counsel for Bolden plaintiffs and counsel for defendants entered into a comprehensive stipulation of facts, which was read into the record. The entire stipulation consumes 31 pages of the record and there are exhibits which supplement the stipulation. The entire stipulation is important to an understanding of the racial discrimination practiced by the Pennsylvania State Police; however, we set forth only some of the items contained in the stipulation:

For approximately the first 50 years of its existence, not one black individual was employed by the State Police. The first minority employed by the State Police was Spanish-surnamed, Salvador L. Rodriguez, appointed February 3, 1947. The first black was appointed on October 18, 1954. At the time of the stipulation, there were 4173 individuals employed by the Pennsylvania State Police; 60 of whom were black, and two of whom were Spanish-surnamed. The total minority repesentation was 1.48% of the total trooper personnel; non-whites employed by all Pennsylvania State Agencies constituted 10.8% of the total state personnel.

On September 17, 1971, Governor Shapp created the Governor's Equal Rights Task Force to identify those aspects of the government which denied and prevented equal opportunities in employment for minorities and women; this action was taken pursuant to Executive Directive No. 21.

Other relevant stipulations are set forth below:

"18. After a thorough investigation of all Pennsylvania agencies, the Equal Rights Task Force identified, inter alia, the Pennsylvania State Police as an agency of state government which had in the past discriminated in employment against minorities.

Furthermore, the Task Force and its successor, the Affirmative Action Counsel has, on three separate occasions, rejected the affirmative action plans that were submitted by the Pennsylvania State Police; the most recent rejection being made on December 27, 1972.

The Pennsylvania State Police have not submitted an affirmative action plan since then, although required to do so by Executive Directive No. 21.

"19. An additional function of the Equal Rights Task Force was to take steps to end discrimination by state governmental agencies, and to improve the condition and composition of the minority work force in state government.

"20. With regard to the Pennsylvania State Police, the Equal Rights Task Force was unable to accomplish the ends in paragraph 19, . . . .

"22. On October 11, 1972, defendant Governor Shapp created the Governor's Affirmative Action Counsel, to succeed the Governor's Equal Rights Task Force.

The purposes of the Council were and are to ensure that minorities and women in state government are affirmatively employed and promoted; and, in so doing, to correct and finally end the serious racial imbalance that exists in those state agencies identified as discriminatory, by the Equal Rights Task Force.

"23. The Affirmative Action Council has not been able, and has, therefore, failed to end the discrimination *inflicted* by the State Police against blacks and other minorities. (Emphasis added)

"24. To be eligible for appointment to the Pennsylvania State Police, an individual must fulfill all of the following requirements:

"a. He or she must be between 21 and 30 years of age, and be a resident of the Commonwealth of Pennsylvania.

"b. He or she must be a high school graduate, or possess a Pennsylvania GED.

"c. He or she must be interviewed by a state-commissioned officer at a local barracks at the time of filing written application, and have, in addition, his or her height, weight, and vision checked.

"d. If found eligible by the commissioned officer, the applicant is invited to take a written examination, which has been prepared by the State Civil Service Commission.

"e. If the applicant passes the written examination, he or she must then take and pass a physical examination.

"f. Thereafter, an applicant must be orally interviewed by three members of the State Police.

"g. Lastly, if the applicant is still eligible, he or she must submit to a background investigation to determine fitness for appointment to the State Police.

"25. Failure of anyone of the above-mentioned criteria, would disqualify the candidate regardless of how well he or she had done on a prior criterion. Furthermore, once rejected, an applicant is discouraged by the State Police from reapplying.

"26. Not one of the eligibility requirements identified in paragraph 25, . . . has been validated, with reasonable accuracy [for] performance on the job.

*Furthermore, the previously-administered written examination, and the preliminary screening process, do not, in fact, accurately predict job performance.*

*The oral interview, as frequently administered in the past, is not reasonably predictive of job performance.* (Emphasis added)

"27. *The utilization of the following eligibility criteria, for employment by the Pennsylvania State Police, has caused discrimination against minority applicants—the written examination, the oral interview and the background investigation.* (Emphasis added)

"29. The Governor's Office of Personnel has concluded that its own studies, and those of its specially retained experts, and those of the Pennsylvania Civil Service Commission, show that the preliminary interview, the written test, the background investigation and the oral interview all discriminate against minorities.

"30. No minority has ever served on the Background Investigation Screening Board or the Oral Interview Board, both of which are instrumental in the selection of candidates for the State Police."

The parties entered into similar stipulations concerning promotion; however, we will not at this time set out those stipulations, as this part of the request for injunctive relief has been deferred.

After the aforesaid stipulation was entered into evidence and other testimony received corroborative of the stipulation, the parties, at the request of defendants, entered into the negotiations which led to the Bolden consent decree.

### III

The consent decree is 17 pages in length and we set forth here some of the relevant portions dealing with hiring procedure:

## "I. HIRING PROCEDURE

Plaintiffs and defendants recognize that the responsibilities and duties of members of the Pennsylvania State Police are becoming increasingly more complex and eveny endeavor will be made to attract the most qualified and competent candidates for these professional positions. Plaintiffs and defendants recognize that at the present time there are insufficient minority (i. e. non-whites and Spanish-surnamed individuals) members of the Pennsylvania State Police, and that every endeavor should and will be made to increase the minority membership of the Pennsylvania State Police to the point where the percentage of minorities on the Pennsylvania State Police force is approximately equal to the percent of minorities in the Pennsylvania labor force from which State Police men and women are selected. In order to achieve these two goals, plaintiffs and defendants agree, with respect to hiring procedure and goals, as follows:

"1. The defendant Pennsylvania State Police shall establish an eligibility list of qualified applicants for hiring for each State Police Academy class and shall rank such applicants in the manner specified in paragraph I.2 and I.3(a) to (e). At least one third (33⅓ percent) of all candidates selected for each Academy class from such list shall be minorities, provided that there is a sufficient number of qualified minority applicants. This

one third ratio shall continue until such time as nine point two percent (9.2%) of the enlisted complement of the Pennsylvania State Police consists of minorities.

·  ·  ·  ·  ·  ·

"3. Pending Court approval of defendants validated selection criteria, the following interim standard shall be used to determine the qualifications of applicants for State Police membership:

·  ·  ·  ·  ·  ·

"(d) *Post-Examination Application Procedure and Additional Criteria for Selection.*

(1) From those applicants who have passed the written examination the State Police shall select a number of said applicants for further processing. These applicants shall be selected in accordance with their test scores, and the State Police shall select for further processing as many applicants who passed the examination as are necessary to fill the projected cadet class and meet the minority hirigng ratio set forth in paragraph I(3)(e) below. All such applicants who pass the written examination shall be furnished a full application for employment to be completed and submitted to the defendant, Pennsylvania State Police.

·  ·  ·  ·  ·  ·

"(e) *Selection of Cadet Class.*

Pending validation of the employment criteria of the Pennsylvania State Police, cadet classes shall be selected on the basis of the interim criteria described above. Classes shall be selected from a list comprised of qualified candidates who have passed all of the examinations, interviews, and other requirements described above. Such applicants shall be listed in the order of their combined scores on the written examination and oral interview. The written examination shall count as seventy (70) percent of

the final score and the oral interview shall count as thirty (30) percent of the final score. Selections shall be made from said list in the order in which the applicants appear on said list, provided selection in this manner results in a class which shall be comprised of at least one-third (⅓) minority members until the above described nine point two percent (9.2%) quota is reached. If selection of a class in this manner does not produce the aforesaid result and if there are additional minorities in the pool of qualified applicants, said qualified minorities shall be selected for the class until either the aforesaid ratio is reached for the class or the pool of qualified minorities is exhausted. This selection procedure is hereby declared by the Court to be required as a matter of Federal law notwithstanding any provisions of State law to the contrary."

In the Oburn and Lutz actions, plaintiffs sought to prove that the test given the latest class of applicants was in fact valid and not culturally biased. Plaintiffs rely on testimony of Edgar L. Yost, Chief of Evaluation of the Pennsylvania State Civil Service Commission, who testified that he believed that the latest test given was valid and job-related. However, he admitted that none of the standard tests for validity had been done and that, in fact, a job analysis, which forms the basis for the test, has not as yet been completed. In evaluating Mr. Yost's testimony, the Court also considers paragraph 2 of section 1 of the consent decree concerning hiring procedures:

"2. The defendants shall retain an independent and qualified expert to obtain validated and job-related tests and other criteria for employment of Pennsylvania State Police members. Each test, standard or other criteria for employment shall be validated to predict job performance in compliance with Equal Employment Opportunity Commission guidelines or other applicable Federal and State law. Upon the development of such validated selection tests, standards and other criteria for employment, defendants shall submit evidence of their validity for approval by the Court. Counsel for the plaintiffs shall be furnished such evidence prior to submission to the Court. If the Court finds that the defendants proposed selection criteria are in fact valid and job-related, defendants may thereupon institute said criteria for the ranking and selection of qualified applicants for membership in the Pennsylvania State Police."

Mr. Yost admitted that the tests required by said paragraph have not been completed and the Court notes that the consent decree requires submission of any new selection criteria to the Court and a determination by the Court that the criteria are valid and job-related.

Plaintiffs also rely upon testimony given by Major Hileman in a hearing in the Lutz action, which was held before the Hon. R. Dixon Herman. Major Hileman testified that it was his opinion that the Civil Service Commission attempted to remove cultural bias from the examination. There is no evidence that Major Hileman is an expert in this regard nor is there any evidence that he has personal knowledge whether or not cultural bias was in fact eliminated from the examination. Again, the Court notes that if there was such a change in the selection procedure, the consent decree in Bolden requires the defendants in the Bolden case to submit it to the Court for approval. No such submission of material has been offered to the Court. Accordingly, the Court finds that the tests given to the latest class of applicants is not validly job-related or free of cultural bias.

## IV

The plaintiffs mount an essentially four-pronged attack on the affirmative relief ordered by the Court in the Bolden decree. First, they argue that the affirmative race conscious hiring relief violates their rights to the equal protec-

tion of the laws. Second, they argue that the relief is unwise and/or an abuse of remedial-equitable discretion. Third, they argue that this Court was without jurisdiction to enter class wide relief in that there had been no certification of the Bolden action as a class action. Fourth, they argue that a single district court judge lacked the authority to enter the Bolden consent decree.

## A

The plaintiffs request that a three-judge court be convened pursuant to 28 U.S.C.A. § 2281, in that they wish to enjoin the enforcement of a state statute, i. e., 71 P.S. § 251. That statute provides that the Commissioner of the Pennsylvania State Police shall, subject to the approval of the Governor, prescribe the qualifications for membership and retention in the State Police. Plaintiffs argue that the interim selection and promotion criteria set out in the Bolden consent decree are an authoritative interpretation of that statute and so that they, in effect, seek an injunction against the enforcement of a state statute. Alternatively, plaintiffs argue that if the interim criteria set out in the consent decree are inconsistent with the statute then the Bolden decree enjoined a state statute in violation of 28 U.S.C. § 2281 in that the Bolden decree was entered by a single judge.

■■ The relief requested by plaintiffs does not require that this Court convene a three-judge court. The present procedures of the defendants are the result of the order of this Court and a suit seeking an injunction against those procedures is not one which brings into play the policies upon which the three-judge court acts are premised. With respect to plaintiffs' alternative argument, the procedures defendants presently follow, pursuant to the Bolden order, are in no manner inconsistent with the state statute nor did the Bolden action even remotely call the constitutionality of that statute into question.

In short, cutting through plaintiffs' semantics, the real issue is the validity of the Bolden consent decree.

## B

■ The Bolden action was filed as a class action and, in fact, a motion was filed to so certify the action. It is the opinion of this Court that the entry of the consent decree in that action is sufficient certification of the Bolden action, as a class action, under F.R.Civ.P. 23. The decree fully defines the class involved.

■■ The plaintiffs have raised the question of notice. An action brought for injunctive, and ancillary relief from discrimination in employment is properly maintainable as a class action under F.R.Civ.P. 23(b)(2) and does not require notice under F.R.Civ.P. 23(c)(2). Wetzel v. Liberty Mutual Insurance Company, 508 F.2d 239 (3d Cir., 1975). Consequently, it was not necessary that notice of the pendency of the action with the opportunity to opt-out be sent to class members in the Bolden action. Of course, the requirement of F.R.Civ.P. 23(e) that notice of a proposed compromise of a class action shall be given to all members of the class applies to a class action under F.R.Civ.P. 23(b)(2); however, that notice is to be given in such manner as the court directs. In the Bolden action, the consent decree was posted. Moreover individual notice was provided to identifiable members of the class. See Sections I(f) and (g) of consent decree. This Court retained jurisdiction over the Bolden action and a dissatisfied class member could and still can seek to intervene and modify the decree. This procedure provided adequate and practical notice in the context of the Bolden lawsuit.

Of course, it is unclear that the plaintiffs, who do not claim to be members of the class in Bolden, have standing to raise an issue of inadequate notice to class members. The plaintiffs in these actions, i. e., the Oburn and Lutz lawsuits, not members of the class in Bol-

den, do not and cannot cite any authority for the proposition that they were entitled to notice of either the pendency or compromise of the Bolden action. Moreover, as noted above, the Court retains jurisdiction in the Bolden lawsuit and the plaintiffs here may seek to intervene in that action.

Finally, the plaintiffs attack on the class relief awarded by this Court in Bolden reflects a fundamental misunderstanding of the law in this area which is reflected in a number of its arguments before this Court.

In a case of racial discrimination in any sector of our society, the nature of the wrong charged, i. e., a class wrong, dictates class relief.

In Bailey v. Patterson, 323 F.2d 201, 206 (5th Cir. 1963), cert. den., 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964), a case attacking segregated transportation service on carriers, the Court stated:

"We find it unnecessary to determine, however, whether this action was properly brought under Rule 23(a), for whether or not appellants may properly represent all Negroes similarly situated, the decree to which they are entitled is the same. Appellants do not seek the right to use those parts of segregated facilities that have been set aside for use by 'whites only'. They seek the right to use facilities which have been *desegregated*, that is, which are open to all persons, appellants and others, without regard to race. The very nature of the rights appellants seek to vindicate requires that the decree run to the benefit not only of appellants but also for all persons similarly situated."

■ Similarly, in Bolden, the plaintiffs did not merely seek the opportunity to become and remain members of the Pennsylvania State Police as it existed; rather they sought the opportunity to become and remain members of a drastically altered Pennsylvania State Police organization, i. e., an organization that did not discriminate against applicants

and members on the basis of race. The plaintiffs were clearly entitled to such relief and class relief was required to secure that right. Indeed, the Court could not and would not have approved a decree that provided for less than class relief. In light of the record in Bolden, the Court could not have, consistent with its obligation under the United States Constitution, ordered less than class relief.

As the Fifth Circuit said in Potts v. Flax, 313 F.2d 284, 289–90 (5th Cir. 1963), a school desegregation case:

"There is at least considerable doubt that relief confined to individual specified Negro children either could be granted or, if granted, could be so limited in its operative effect. By the very nature of the controversy, the attack is on the unconstitutional practice of racial discrimination. Once that is found to exist, the Court must order that it be discontinued. Such a decree, of course, might name the successful plaintiff as the party not to be discriminated against. But that decree may not—either expressly or impliedly—affirmatively authorize continued discrimination by reason of race against others. Cf. Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161. Moreover, to require a school system to admit the specific successful plaintiff Negro child while others, having no such protection, were required to attend schools in a racially segregated system, would be for the court to contribute actively to the *class* discrimination proscribed by Bush v. Orleans Parish School Board, 5 Cir., 1962, 308 F.2d 491, 499, on rehearing 308 F.2d 503; see also Ross v. Dyer, 5 Cir., 1962, 312 F.2d 191. The effect of this last consideration is to afford additional basis for affirmance. In this light, if it was an error to treat the case as a class suit and enter such a decree, such error, if any, was harmless since the decree for all practical purposes

would have been the same had it been confined to the Teal or Flax children."

In light of these fundamental principles of the law on racial discrimination, plaintiffs' argument that the Court was without jurisdiction to grant class relief in Bolden is frivolous.

### C

The evidence in Bolden of racial discrimination by the Pennsylvania State Police was overwhelming. We need not recite the numerous Supreme Court and lower federal court cases authorizing and, indeed, mandating affirmative remedial action in the face of such established racial discrimination in many contexts.

We will only refer in detail to the decision of Erie Human Relations Commission v. Tullio, 493 F.2d 371 (3d Cir. 1974). That case involved a finding that a pattern of racial discrimination had existed for a considerable period of time in the selection of officers for the Police Department of the City of Erie, Pennsylvania. The district court imposed a "limited racial hiring quota" as part of the remedy. It provided that in filling the next twenty positions, a sufficient number of black candidates were to be nominated from existing eligibility lists so that no less than ten black candidates would be appointed unless the list of eligible black candidates was sooner exhausted. In affirming this aspect of the district court's remedy, the Third Circuit stated:

"Finally, we note that the quota was designed to take advantage of the unique opportunity presented by the creation of 20 new police positions through a special state grant. We cannot say that the district court abused its discretion in using this grant as a vehicle to expedite the removal of the effects of the discrimination found here. Indeed, given the sensitive and highly visible role played by the police in maintaining racial peace and harmony, we feel that we should commend the district court

since its order acts decisively and yet at the same time is carefully limited so that its adverse impact on others is minimized. Imposition of a 50% quota limited to the next 20 positions is not reversible error in these circumstances. [7]

[7]. Before concluding our discussion of the claims raised with regard to the relief ordered, we should note that while constitutional objections to the imposition of remedial quotas based on race have been raised in other cases, see, e. g., Porcelli v. Titus, 431 F.2d 1254 (3d Cir. 1970); Bridgeport Guardians, Inc. v. Civil Service Comm'n, 482 F.2d 1333 (2d Cir. 1973); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1972) (en banc); DeFunis v. Odegaard, 82 Wash.2d 11, 507 P.2d 1169 (1973), cert. granted, 414 U.S. 1038, 94 S.Ct. 538, 38 L.Ed.2d 329 (1973), no such contention appears to be raised here. However, even if it could be argued that constitutional contentions are implicit in the appellants' brief, the bulk of the cases that have dealt with these considerations both in this circuit, Porcelli v. Titus, supra; Contractors Ass'n v. Secretary of Labor, 442 F.2d 159 (3d Cir. 1971); Commonwealth of Pennsylvania v. Sebastian, 368 F.Supp. 854 (W.D.Pa., filed Dec. 1, 1972) (unreported), aff'd by judgment order, 480 F.2d 917 (3d Cir. filed June 7, 1973), and elsewhere, see, e. g., Bridgeport Guardians, Inc. v. Civil Service Comm'n, supra; Carter v. Gallagher, supra; DeFunis v. Odegaard, supra, have upheld the constitutionality of the use of quotas to eliminate the effects of discrimination. Since the disparity between blacks on the police force (1.-4%) and blacks in Erie (6.8%) indicates that serious discriminatory effects are present here, this precedent would appear to be controlling on the question in any event."

Erie Human Relations Commission v. Tullio, *supra*, at 375.

Recognizing the sensitivity of this issue, we address the arguments advanced by the plaintiffs not necessarily in the order they presented them.

First, plaintiffs argue that generalized findings of past discrimination are an inadequate basis for the type of relief involved here and suggest the relief in Bolden was not based on specific findings of discrimination in a specific context. In a related vein, plaintiffs argue that a mere stipulation provides an inadequate basis for such relief. We

note that the entire evidentiary record in Erie Human Relations Commission v. Tullio, *supra*, was, in fact, a stipulation. Moreover, this Court took a significant amount of testimony in Bolden, in addition to the stipulation of facts, and as set out above, there is overwhelming evidence of discrimination by the Pennsylvania State Police. The factual predicate of plaintiffs' argument is totally erroneous.

■ Second, plaintiffs argue that any affirmative relief must be limited to the particular individuals previously discriminated against. This argument reflects a fundamental misconception of what these lawsuits are all about. Such an argument, of course, is totally at odds with the relief ordered in numerous lawsuits. The wrong with which we are concerned in these cases is not an individual wrong but a class wrong; consequently, the remedy must be a class remedy. The Bolden decree, as more specifically set out below, merely prevents the continued discrimination against a class and nothing more.

The third group of arguments by the plaintiffs are: that there are entirely separate admission standards being used with fixed quotas for majority and minority applicants; that appointments are being made without regard to merit but on the basis of race only; that there is now a valid test; and that the present procedures violate the public interest in qualified policemen.

■ The factual predicates of all these arguments are totally erroneous. There is not now nor has there ever been validated selection criteria for admission to the Pennsylvania State Police. Pending the development of constitutional selection criteria: (1) appointments are not being made on the basis of race; rather appointments may be made by defendants, but not discriminatorily, as they have been in the past; (2) the same selection criteria are being applied to both white and minority applicants; (3) all appointees have the necessary qualifications established by the defendants; and (4) the qualifications established ensure the public interest in competent policemen. The plaintiffs have not shown: (1) that the established interim qualifications do not ensure competent policemen; (2) that differences in scores above the qualified level are in any way indicative of a better potential policeman nor that they are any more qualified than any minority member accepted for the March 6 cadet class.

The Bolden decree provides that the defendants are to develop validated selection criteria. In the interim, the decree provides for hiring procedures and a goal of 9.2% minority representation on the Pennsylvania State Police. Interim selection criteria are generally established with defendants setting minimum qualification scores. One-third of each class is to be composed of minority group members provided that there is a sufficient number of qualified minority applicants.

■ There is, as noted above, overwhelming evidence that the selection procedures of the defendants discriminate against minority applicants. Consequently, the defendants then had the burden to prove the selection criteria were valid, job-related tests. This the defendants failed to do. The evidence demonstrates that the selection criteria were, in fact, not valid. Consequently, in Bolden, this Court had before it nonvalid selection criteria that discriminated against minorities.

The Bolden decree allows the defendants to establish standards of qualification to ensure the public interest in competent policemen. However, since these standards are not validated, the decree prohibits the defendants from differentiating, to the detriment of the class found to have been discriminated against, among candidates, on the basis of scores above the level of qualified. Plaintiff's complaint only goes to the method of choice among those candidates who are qualified. This complaint must fail because plaintiffs have no legally cogniza-

ble interest, under the Constitution, in using a discriminatory criterion to advance their economic interest over the class of persons who have been discriminated against in the past and who would continue to be discriminated against, but for the Bolden decree.

■ The plaintiffs completely distort the actions of defendants taken pursuant to this Court's order in Bolden when it states the defendants are appointing cadets on the basis of a "fixed quota". This Court's order and the defendants procedure pursuant thereto only mean that while hiring under its modified present procedures, defendants could not add to the discrimination already caused by its illegal practices. The current procedure only prevents *additional* discrimination, against minority applicants, during the temporary period while defendants develop constitutional selection procedures.

Plaintiffs cannot seriously contend that this Court's order or defendants' conduct gives preference to some applicants over better qualified applicants. There is overwhelming evidence of the discriminatory impact of the defendants' testing procedures; yet there is no evidence the procedures do measure an applicant's qualifications. Consequently, on the basis of this record, there is no reason to believe that black and Spanish-surnamed applicants are not qualified for jobs at the rate at which they apply.

In short, plaintiffs' position is frivolous.

Under the specific facts of this case, the following observation is accurate as to the Bolden consent decree and defendants actions taken pursuant thereto.

"What we have said may require classification by race. That is something which the Constitution usually forbids, not because it is inevitably an impermissible classification, but because it is one which usually, to our national shame, has been drawn for the purpose of maintaining racial inequality. Where it is drawn for the purpose of achieving equality it will be allowed, *and to the extent it is necessary to avoid unequal treatment by race, it will be required.*" Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920, 931–32 (2d Cir. 1968). (Emphasis added; footnotes omitted).

V

In considering plaintiffs' request for injunctive relief, the Court follows the Third Circuit's most recent statement of the applicable standards for issuing a preliminary injunction. In Delaware River Port Authority v. Transamerican Trailer Transport, Inc., 501 F.2d 917 (3d Cir. 1974) the Court stated:

"Underlying our consideration of the issue is the proposition that, as a prerequisite to the issuance of a preliminary injunction the moving party must generally show: (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured pendente lite if relief is not granted to prevent a change in the status quo." 501 F.2d at 919.

Further, the Court stated:

"This Court has repeatedly stated that the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant (3) the possibility of harm to other interested persons from the grant or denial of the injunction and (4) the public interest. It is also clear, however, that consideration of these factors by the district court requires a 'delicate balancing' . . ." 501 F.2d at 920.

The Court in that decision also indicated that even if plaintiff does not demonstrate as strong a likelihood of ultimate success as would generally be required, it may nevertheless be appropriate to grant the Preliminary Injunction if the factors of irreparable injury to movant and others, and the public interest strongly favor it.

■ We hold that a preliminary injunction is inappropriate on the record

in this case. Plaintiffs have not demonstrated a reasonable probability of eventual success[1]. Nor have plaintiffs demonstrated that they will suffer irreparable injury; certainly the Court can fashion remedies, including damages and future admission to the State Police, should plaintiffs eventually succeed.

Finally, there is a substantial possibility of harm to all of the citizens of the Commonwealth, because the evidence supports the finding that there is a present need for the additional state troopers.

## VI

In addition to the unsuccessful attack by plaintiffs on the affirmative relief ordered by the Court in the Bolden decree, the Court finds that there is another reason the plaintiffs have failed to show a reasonable probability of eventual success in this litigation. At the preliminary injunction hearing plaintiffs' counsel has argued that the instant action in no way relates to Bolden. However, upon reading plaintiffs' complaints and noting the relief sought therein the Court can reach but one conclusion. The plaintiffs are asking the Court to enjoin the defendants from a course of conduct which has been mandated by the Bolden consent decree. Clearly, the plaintiffs in the instant action are attempting collaterally to attack the consent decree and the implementation of the Court's Order in Bolden. The law in this area is clear and the Court finds the case of Black and White Children of the Pontiac School System v. School District of Pontiac, 464 F.2d 1030 (6th Cir. 1973) to be instructive.

In *Pontiac School*, a class of plaintiffs sought an injunction restraining the Pontiac School District from transporting children, pursuant to an order of the U.S. District Court for the Eastern District of Michigan. The complaint was referred to the same District Judge who had entered the order sought to be enjoined and, after oral argument, he dismissed the complaint on the ground that plaintiffs' suit was an attempt collaterally to attack the desegregation order entered in the prior case. The United States Court of Appeals for the Sixth Circuit affirmed the lower court decision and stated:

> Plainly, plaintiffs have mistaken their remedy. . . . The proper avenue for relief if there were unanticipated problems which had developed in the carrying out of the court's order, was an application to intervene and a motion for additional relief in the principal case. 464 F.2d at 1030.

The Court has not found, nor have defendants cited, a case on point which contradicts the holding of *Pontiac School*. The procedure required by *Pontiac School* would authorize non-participants in the Bolden action to petition to intervene and seek relief. Also, the *Pontiac School* remedy is consistent with Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). Furthermore, see EEOC v. A. T. & T. 506 F.2d 735, (3d Cir. 1974). Consequently, since the procedural posture of the plaintiffs before this Court is indistinguishable from that of the plaintiffs in Pontiac School, the Court finds that there is not a reasonable probability of eventual success in the instant litigation, a prerequisite to the issuance of a preliminary injunction.

## VII

There is one final reason why at least one of the plaintiffs in Oburn, i. e., the Conference of State Police Lodges

---

1. In Oburn, plaintiffs request that the Court "enter an order requiring that veterans preference points be granted applicants on the initial screening or give them their preference as defined in the Pennsylvania Statute." The evidence is uncontradicted that the veterans preference points were allocated without regard to race or minority status and were allocated in the same manner as before the Bolden consent decree, and in accordance with an opinion of the Commonwealth Attorney General. Plaintiffs are not entitled to a preliminary injunction on the basis of this allegation.

of the Fraternal Order of Police, may not eventually succeed in this litigation. From the facts heretofore recited and the colloquy with counsel at the preliminary injunction hearing it is evident that there is substantial evidence that the Fraternal Order of Police actively participated in the negotiations that resulted in the execution of the Bolden consent decree. The resolution of this disputed issue deserves a fuller evidentiary hearing. However, should it be determined that the Fraternal Order of Police did in fact participate in the Bolden case, that they would be bound by the consent decree and it is clear they would be estopped from attacking that consent decree through the avenue of the instant suit. Caterpillar Tractor Co. v. International Harvester Co., 120 F.2d 82 (3d Cir. 1941); Miller v. Meinhard-Commercial Corporation, 462 F.2d 358 (5th Cir. 1972).

For all of the above reasons we deny plaintiffs' request for a preliminary injunction.